No. 20-3134

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

—————————

Matt Dinerstein,

*Plaintiff-Appellant,*

v.

Google, LLC, et al.,

*Defendants-Appellees.*

—————————

On Appeal from the United States District Court
for the Northern District of Illinois,
No. 19-cv-04311
The Honorable Rebecca R. Pallmeyer

—————————

**BRIEF FOR APPELLEES THE UNIVERSITY OF CHICAGO AND THE
UNIVERSITY OF CHICAGO MEDICAL CENTER**

—————————

C. Harker Rhodes IV
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
harker.rhodes@kirkland.com

Brian D. Sieve, P.C.
Michael B. Slade
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 862-2000
bsieve@kirkland.com
mslade@kirkland.com

*Counsel for Appellees The University of Chicago and The University of Chicago
Medical Center*

March 15, 2021

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

**The University of Chicago**
**The University of Chicago Medical Center**

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Kirkland & Ellis LLP**

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any: **N/A**

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock: **N/A**

<div align="right">

KIRKLAND & ELLIS LLP

s/Brian D. Sieve
Brian D. Sieve

*Counsel for Appellees The University of Chicago and The University of Chicago Medical Center*

</div>

March 15, 2021

i

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

**The University of Chicago**
**The University of Chicago Medical Center**

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Kirkland & Ellis LLP**

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any: **N/A**

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock: **N/A**

KIRKLAND & ELLIS LLP

s/Michael B. Slade
Michael B. Slade

*Counsel for Appellees The University of Chicago and The University of Chicago Medical Center*

March 15, 2021

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel furnishes the following statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

**The University of Chicago**
**The University of Chicago Medical Center**

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Kirkland & Ellis LLP**

(3)     If the party or amicus is a corporation:

i)     Identify all its parent corporations, if any: **N/A**

ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock: **N/A**

<div style="margin-left:40%">

KIRKLAND & ELLIS LLP

<u>s/C. Harker Rhodes IV</u>
C. Harker Rhodes IV

*Counsel for Appellees The University of Chicago and The University of Chicago Medical Center*

</div>

March 15, 2021

iii

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ............................................. i

REQUEST FOR ORAL ARGUMENT ................................................................. xiv

INTRODUCTION ................................................................................................. 1

JURISDICTIONAL STATEMENT ...................................................................... 3

STATEMENT OF THE ISSUES .......................................................................... 3

STATEMENT OF THE CASE............................................................................... 4

    A.    The University and Its Privacy Practices .............................................. 4

    B.    The University's Research Partnership with Google ........................... 6

    C.    The Present Litigation ......................................................................... 7

SUMMARY OF ARGUMENT ............................................................................11

STANDARD OF REVIEW ................................................................................. 13

ARGUMENT ....................................................................................................... 14

I.    The District Court Correctly Dismissed Dinerstein's Purported
"Breach of Medical Confidentiality" Claim..................................................... 14

    A.    Dinerstein's Allegations Fail to Show Article III Standing .............. 14

    B.    The District Court Correctly Refused to Create a New State-
Law Tort of "Breach of Medical Confidentiality" on These
Facts.................................................................................................... 19

    C.    There Is No Good Reason to Certify This Case to the Illinois
Supreme Court.................................................................................... 25

II.    The District Court Correctly Dismissed Dinerstein's Breach of
Contract Claim.................................................................................................. 27

    A.    Dinerstein's Allegations Fail to Show Standing ............................... 27

            1.    Article III requires concrete harm, not just the violation
of an abstract legal right......................................................... 28

       2.    Neither of the two theories on which Dinerstein relies is sufficient to show concrete harm .......................................... 33

B.    The District Court Correctly Held That Dinerstein Failed to State Any Contract Claim Because He Failed to Allege Damages ............................................................................................ 37

       1.    Illinois law requires damages to state a breach of contract claim ........................................................................... 37

       2.    Dinerstein has failed to allege actual damages ........................ 40

C.    Dinerstein Also Failed to Allege Any Actual Breach......................... 44

III.    The District Court Correctly Dismissed Dinerstein's ICFA Claim............. 53

A.    The District Court Correctly Held That Dinerstein Lacks Standing.............................................................................................. 53

B.    Dinerstein Also Failed To State Any Consumer Fraud Claim ........... 55

CONCLUSION ..................................................................................................... 58

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Alberts v. Devine*,
    479 N.E.2d 113 (Mass. 1985) ............................................................................23

*Am. Safety Cas. Ins. Co. v. City of Waukegan*,
    678 F.3d 475 (7th Cir. 2012) ............................................................................26

*Anderson v. Marathon Petroleum Co.*,
    801 F.2d 936 (7th Cir. 1986) ........................................................... 20, 21, 25, 44

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................... 50, 56

*Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*,
    493 F.3d 841 (7th Cir. 2007) ............................................................................38

*Attias v. CareFirst, Inc.*,
    365 F.Supp.3d 1 (D.D.C. 2019) .......................................................................34

*Austin-Spearman v. AARP*,
    119 F.Supp.3d 1 (D.D.C. 2015) .......................................................................35

*Avery v. State Farm Mut. Auto. Ins. Co.*,
    835 N.E.2d 801 (Ill. 2005) ...............................................................................57

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................... 50, 51

*Benson v. Fannie May Confections Brands, Inc.*,
    944 F.3d 639 (7th Cir. 2019) ....................................................................... 55, 56

*Berry v. Moench*,
    331 P.2d 814 (Utah 1958) ................................................................................22

*Best v. Taylor Mach. Works*,
    689 N.E.2d 1057 (Ill. 1997) .............................................................................24

*Biddle v. Warren Gen. Hosp.*,
    715 N.E.2d 518 (Ohio 1999) ............................................................................23

*BKCAP, LLC v. CAPTEC Franchise Tr. 2000-1*,
   572 F.3d 353 (7th Cir. 2009) ................................................................44

*Brandt v. Med. Def. Assocs.*,
   856 S.W.2d 667 (Mo. 1993) ................................................................23

*Brown v. Argosy Gaming Co., L.P.*,
   384 F.3d 413 (7th Cir. 2004) ................................................................26

*Brunett v. Convergent Outsourcing, Inc.*,
   982 F.3d 1067 (7th Cir. 2020) ....................................................... 30, 31

*Byrne v. Avery Ctr. for Obstetrics & Gynecology, P.C.*,
   175 A.3d 1 (Conn. 2018) ................................................................22

*Calderon-Ramirez v. McCament*,
   877 F.3d 272 (7th Cir. 2017) ................................................................13

*Carlsen v. GameStop, Inc.*,
   833 F.3d 903 (8th Cir. 2016) ................................................................35

*Casillas v. Madison Ave. Assocs., Inc.*,
   926 F.3d 329 (7th Cir. 2019) ....................................................... 31, 33

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................... 15, 16, 17, 19

*Engl v. Nat. Grocers by Vitamin Cottage, Inc.*,
   2016 WL 8578252 (D. Colo. Sept. 21, 2016) ..................................35

*Fairfax Hosp. v. Curtis*,
   492 S.E.2d 642 (Va. 1997) ................................................................23

*Giammanco v. Giammanco*,
   625 N.E.2d 990 (Ill. App. 1993) ..........................................................39

*Goldberg v. 401 N. Wabash Venture LLC*,
   755 F.3d 456 (7th Cir. 2014) ................................................................25

*Gracey v. Eaker*,
   837 So.2d 348 (Fla. 2002) ................................................................23

*Groshek v. Time Warner Cable, Inc.*,
  865 F.3d 884 (7th Cir. 2017)..................................................................18

*Gubala v. Time Warner Cable, Inc.*,
  846 F.3d 909 (7th Cir. 2017)........................................... 31, 32, 36, 55

*Gunn v. Thrasher, Buschmann & Voelkel, P.C.*,
  982 F.3d 1069 (7th Cir. 2020)................................................................31

*Gust K. Newberg Constr. Co. v. E.H. Crump & Co.*,
  818 F.2d 1363 (7th Cir. 1987)................................................................20

*H.A.L. NY Holdings, LLC v. Guinan*,
  958 F.3d 627 (7th Cir. 2020)......................................................... 25, 26

*Hentze v. Unverfehrt*,
  604 N.E.2d 536 (Ill. App. 1992) ............................................................39

*Hermitage Corp. v. Contractors Adjustment Co.*,
  651 N.E.2d 1132 (Ill. 1995) ...................................................................39

*Humphers v. First Interstate Bank of Oregon*,
  696 P.2d 527 (Or. 1985) ........................................................................22

*Hydrite Chem. Co. v. Calumet Lubricants Co.*,
  47 F.3d 887 (7th Cir. 1995) ...................................................................38

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*,
  912 F.3d 316 (6th Cir. 2018) .................................................................44

*Insolia v. Philip Morris Inc.*,
  216 F.3d 596 (7th Cir. 2000)......................................................... 20, 21, 25

*J.P. Morgan Chase Bank, N.A. v. McDonald*,
  760 F.3d 646 (7th Cir. 2014)..................................................................29

*Khan v. Children's Nat'l Health Sys.*,
  188 F.Supp.3d 524 (D. Md. 2016) .........................................................35

*Kidwell v. Eisenhauer*,
  679 F.3d 957 (7th Cir. 2012)..................................................................44

*Kim v. Carter's, Inc.*,
    598 F.3d 362 (7th Cir. 2010)................................................................ 53, 55, 56

*Larkin v. Fin. Sys. of Green Bay, Inc.*,
    982 F.3d 1060 (7th Cir. 2020).............................................................. 31, 32

*Lawson v. Halpern-Reiss*,
    212 A.3d 1213 (Vt. 2019)........................................................................23

*Lewert v. P.F. Chang's China Bistro, Inc.*,
    819 F.3d 963 (7th Cir. 2016)......................................................... *passim*

*Lexington Ins. Co. v. Rugg & Knopp, Inc.*,
    165 F.3d 1087 (7th Cir. 1999)..................................................................20

*Lopardo v. Fleming Cos.*,
    97 F.3d 921 (7th Cir. 1996)......................................................................20

*Lozada v. Advoc. Health & Hosps. Corp.*,
    2018 IL App (1st) 180320-U.....................................................................41

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................... 14, 15, 28

*Marcatante v. City of Chi.*,
    657 F.3d 433 (7th Cir. 2011)....................................................................10

*Marque Medicos Fullerton, LLC v. Zurich Am. Ins. Co.*,
    83 N.E.3d 1027 (Ill. App. 2017)...............................................................48

*Meyers v. Nicolet Rest. of De Pere, LLC*,
    843 F.3d 724 (7th Cir. 2016)............................................................... 31, 32

*Mohanty v. St. John Heart Clinic, S.C.*,
    866 N.E.2d 85 (Ill. 2006).........................................................................40

*Morris v. Consolidation Coal Co.*,
    446 S.E.2d 648 (W. Va. 1994)..................................................................23

*Mosier v. Vill. of Holiday Hills*,
    128 N.E.3d 1210 (Ill. App. 2019).......................................................38, 40

*Mull v. String*,
    448 So.2d 952 (Ala. 1984)......................................................................23

*Mulligan v. QVC, Inc.*,
    888 N.E.2d 1190 (Ill. App. 2008) .......................................................53

*Nettles v. Midland Funding LLC*,
    983 F.3d 896 (7th Cir. 2020)...............................................................31

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)............................................................................28

*Petrillo v. Syntex Labs., Inc.*,
    499 N.E.2d 952 (Ill. App. 1986) ........................................................24

*Pirelli Armstrong Tire Corp. v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011)...............................................................57

*Pisciotta v. Old Nat'l Bancorp*,
    499 F.3d 629 (7th Cir. 2007)...............................................................20

*Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*,
    525 F.3d 533 (7th Cir. 2008)................................................. 38, 39, 40

*Remijas v. Neiman Marcus Grp.*,
    794 F.3d 688 (7th Cir. 2015)...................................................... *passim*

*Runyon v. Smith*,
    749 A.2d 852 (N.J. 2000)....................................................................22

*Ry. Express Agency, Inc. v. Super Scale Models, Ltd.*,
    934 F.2d 135 (7th Cir. 1991)...............................................................21

*Sabrina Roppo v. Travelers Com. Ins. Co.*,
    869 F.3d 568 (7th Cir. 2017).........................................................9, 20

*Schaffer v. Spicer*,
    215 N.W.2d 134 (S.D. 1974) ..............................................................22

*Siddique v. Laliberte*,
    972 F.3d 898 (7th Cir. 2020)......................................... 37, 43, 54, 56

*Silha v. ACT, Inc.*,
   807 F.3d 169 (7th Cir. 2015) ........................................................ 29, 36

*Simonsen v. Swenson*,
   177 N.W. 831 (Neb. 1920) ................................................................22

*Smith v. GC Servs. Ltd. P'ship*,
   986 F.3d 708 (7th Cir. 2021) ........................................................ 30, 31

*Spokeo v. Robins*,
   136 S.Ct. 1540 (2016) ............................................................. *passim*

*Spuhler v. State Collection Serv., Inc.*,
   983 F.3d 282 (7th Cir. 2020) ............................................................31

*State Farm Mut. Auto. Ins. Co. v. Pate*,
   275 F.3d 666 (7th Cir. 2001) ........................................................ 25, 26

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ..........................................................................15

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................28

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .................................................................... 14, 28

*TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*,
   491 F.3d 625 (7th Cir. 2007) ................................................... 38, 39, 40

*Thole v. U.S. Bank N.A.*,
   140 S.Ct. 1615 (2020) ............................................................. 9, 28, 30

*Thomason v. Nachtrieb*,
   888 F.2d 1202 (7th Cir. 1989) ..........................................................19

*Thompson v. Gordon*,
   948 N.E.2d 39 (Ill. 2011) .................................................................48

*U.S. Dep't of Just.*
   *v. Reporters Comm. for Freedom of the Press*,
   489 U.S. 749 (1989) ........................................................................18

*Uzuegbunam v. Preczewski*,
   No. 19-968, 2021 WL 850106 (U.S. Mar. 8, 2021)......................................30, 31

*Vassiliades v. Garfinckel's*,
   492 A.2d 580 (D.C. 1985).......................................................................23

*Vill. of Bedford Park v. Expedia, Inc.*,
   876 F.3d 296 (7th Cir. 2017)..............................................................25, 26

*W.W. Vincent & Co. v. First Colony Life Ins. Co.*,
   814 N.E.2d 960 (Ill. App. 2004) ..........................................................38

*Warth v. Seldin*,
   422 U.S. 490 (1975).............................................................................14

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990).............................................................................15

*Wigod v. Wells Fargo Bank, N.A.*,
   673 F.3d 547 (7th Cir. 2012)........................................................38, 40, 43

*Young v. Murphy*,
   90 F.3d 1225 (7th Cir. 1996)........................................................36, 42, 55

## Statutes

28 U.S.C. §1332(d) ...................................................................................8

77 Ill. Admin. Code §250.130.................................................................52

Health Insurance Portability and Accountability Act,
   Pub. L. No. 104-191, 110 Stat. 1936 (1996)..........................................4

Restatement (Second) of Contracts (1981) .............................................40

Restatement (Third) of Restitution and Unjust Enrichment (2011) .......................43

## Other Authorities

Dep't of Health & Human Servs.,
   *Model Notices of Privacy Practices*,
   https://bit.ly/3tcV3G7 (last accessed Mar. 15, 2021) .........................46

*Notice of Privacy Practices*,
    https://bit.ly/3cpNN2L (last accessed Mar. 15, 2021) ........................................46

*sale*, Black's Law Dictionary (11th ed. 2019) .........................................................48

**Rule**

Fed. R. Civ. P. 9(b) ..................................................................................................57

**Regulations**

45 C.F.R. §164.502 ...................................................................................................47

45 C.F.R. §164.508 .............................................................................................. 46, 47

45 C.F.R. §164.512 .............................................................................................. 48, 51

45 C.F.R. §164.514 .............................................................................................. 50, 51

45 C.F.R. §164.520 ...................................................................................... 45, 46, 47, 49

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Circuit Rule 34(f), Appellees respectfully submit that oral argument is warranted and would aid the Court in resolving the legal issues presented in this case.

**INTRODUCTION**

Four years ago, Appellees The University of Chicago and The University of Chicago Medical Center (together, "the University") partnered with Appellee Google LLC ("Google") on a research project to use machine-learning techniques to create new models to predict future healthcare needs and outcomes. As part of that research project, the University examined certain data from its records of patient encounters from January 2010 to June 2016, removed patient identifiers (such as a patient's name, address, or telephone number), and provided that non-identified information to Google under a data use agreement in which Google specifically agreed that it would not attempt to re-identify any person. As far as the record shows, Google has fully kept that promise, and has made no attempt to connect any of the data it received with any particular individual.

Appellant Matt Dinerstein nevertheless filed this purported class action against both the University and Google, seeking to hold them liable for millions of dollars on the theory that sharing data without direct identifiers invaded his privacy and breached the University's commitment to abide by its privacy policies and by state and federal law. In a 46-page opinion, the district court dismissed Dinerstein's amended complaint, explaining in detail that none of his claims had any merit. Dinerstein's appeal is equally meritless, and this Court should affirm.

Dinerstein's lead argument on appeal is that the district court erred by refusing to invent a new Illinois tort claim for "breach of medical confidentiality"—a claim Dinerstein concedes he never raised in his amended complaint and Illinois courts have never recognized. That argument plainly fails. Dinerstein's conjecture that Google may someday invade his privacy by re-identifying his medical information, despite explicitly promising not to do so, is too speculative to support Article III standing. Even if Dinerstein could show standing, federal courts are not in the business of concocting new state-law tort claims—especially where, as here, *no* other jurisdiction has found an actionable tort claim on comparable facts (the disclosure of *non-identified* medical data, for research purposes, to a recipient who specifically agreed not to re-identify any records). Given the absence of any authority from *any* court adopting that claim, and Dinerstein's own choice to bring his suit in federal court in the first instance, his request for certification to the Illinois Supreme Court is equally meritless.

Dinerstein's breach of contract and consumer fraud claims likewise fail. Dinerstein again lacks Article III standing to raise these claims, because his allegations fail to show any concrete harm from the alleged violations of his legal rights. The only two theories of purported harm that Dinerstein has advanced—that he "overpaid" for his medical services or lost the "economic value" of his data— have been repeatedly rejected by this Court under comparable circumstances and are

2

facially implausible on these facts. Dinerstein cannot avoid those holdings by pointing to alternative remedies that could only become available *if* he had already pleaded a valid claim (and that would not be available here in any event). Even if Dinerstein had standing, moreover, his claims fail on the merits. Actual damages are a necessary element of any Illinois contract claim, and (as Dinerstein concedes) actual pecuniary loss is a necessary element of any Illinois consumer fraud claim. Dinerstein's allegations fail to show either. Dinerstein's pleadings also fail to plausibly assert any actual breach of contract or any kind of consumer fraud. The district court correctly dismissed all of Dinerstein's claims, and this Court should affirm.

## JURISDICTIONAL STATEMENT

The district court lacked jurisdiction over this action because Dinerstein lacks Article III standing. *See infra* pp.14-19, 27-37, 53-55. Dinerstein's jurisdictional statement is otherwise complete and correct.

## STATEMENT OF THE ISSUES

1. Whether Dinerstein's allegation that Google could theoretically re-identify his medical information at some unspecified future date—despite having explicitly agreed not to do so—is sufficient to establish Article III standing.

2. Whether the district court correctly declined to create a new state-law "breach of medical confidentiality" tort that Dinerstein never pleaded in his

complaint and that neither the Illinois courts nor any other court has recognized on comparable facts.

3. Whether Dinerstein's breach of contract and consumer fraud allegations are sufficient to establish Article III standing despite failing to show any actual injury, and if so, whether the district court correctly dismissed those allegations in any event because they fail to state a viable claim.

## STATEMENT OF THE CASE

This putative class action seeks to hold the University and Google liable for partnering in a research program to develop new predictive health models by using machine-learning techniques on medical data without patient identifiers.

### A.     The University and Its Privacy Practices.

The University operates a world-class hospital and medical research center treating patients with a wide variety of health conditions. When the University provides care to a patient, it collects information about the patient and care provided, which is stored in electronic health records. A57.

To ensure patients are fully informed about the University's privacy practices, and as required by the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996) ("HIPAA"), the University provides patients— and provided Dinerstein—with a Notice of Privacy Practices (the "Notice") that "describes how medical information about [patients] may be used and disclosed."

A94 (capitalization altered); *see* A80, A83.   The Notice describes several "circumstances in which we may use and share your medical information," A95, including by explaining to patients that "[w]e perform research at UCMC" and that "[o]ur researchers may use or share your information without your authorization … if the group that oversees research gives them permission to do so" or if "the patient data is being used to prepare for a research study." A97.  The Notice also explains that the University does not share medical information for other reasons or sell it without written permission.  A98.

All University patients, including Dinerstein, also sign an Admission and Outpatient Agreement and Authorization (the "Authorization"), under which patients acknowledge that they "understand and agree that my medical information in any form … may be used and shared for research." A93.  Patients agree that "such research … may have commercial value and, in that event, I understand that I will not be entitled to any compensation, regardless of the value of such research or any products or inventions developed therefrom." *Id*.  The Authorization further explains that the University takes all efforts to protect patient privacy, that any use of medical information by the University will comply with federal and state law and with the Notice, and that patient identities will not be included in any research findings or reports. *Id*.

**B.     The University's Research Partnership with Google.**

In May 2017, the University and Google announced a new research partnership to apply machine-learning techniques to create predictive health models aimed at reducing hospital admissions and anticipating future medical events.  A2, A4, A65.  That research partnership was reviewed and approved by an institutional review board, *see* A31, and governed by a written Data Use Agreement ("DUA") setting out the terms of the parties' cooperation (including their intent to jointly publish the results of their research) and ensuring patient privacy and compliance with applicable law.  A102-11.

Under the DUA, the University extracted certain data fields from its records of patient encounters that occurred between January 2010 and June 2016, excluding any direct patient identifiers such as the patient's name, address, social security number, or telephone number.  A66-67, A110-11.  The University then provided that data with direct identifiers removed (the "Limited Data Set") to Google subject to the terms of the DUA, under which Google agreed that it would use that information only for the specific research activities enumerated in the DUA and only in accordance with federal law.  Google agreed, for example, that it would "limit its use of the Limited Data Set and protect the Limited Data Set according to the terms and conditions of this DUA and HIPAA, and corresponding [federal regulations]," A102; that the information was made available "solely for use by [Google] as

permitted under the terms of this DUA and in the performance of the [enumerated research activities]," A103; that Google "cannot use or further disclose the Limited Data Set in a manner that would violate [specified federal regulations]," *id*; that Google would "only use and disclose the Limited Data Set as permitted under the terms of this DUA or as required by law" and "not otherwise use or disclose the Limited Data Set," A104; and that Google would "use all appropriate safeguards to prevent the use or disclosure of the Limited Data Set other than as permitted under this DUA," *Id*. In particular, Google specifically and explicitly agreed "not to use the Limited Data in … a way as to identify any individual." *Id*.

The DUA further provided that the Limited Data Set would "be and remain the sole property of [the University]," and that Google would return or destroy all protected health information it received from the University upon termination of the agreement. A105, A108. As part of their research partnership, Google also agreed that the University would hold "a nonexclusive, perpetual license to use the [models developed] under this DUA for internal non-commercial research purposes." A105.

### C.    The Present Litigation.

Dinerstein brought this putative class action against the University and Google in June 2019, and after both defendants filed motions to dismiss, filed an amended complaint in October 2019. In his amended complaint, he alleges he was treated by the University in June 2015, and (on information and belief) that certain

data related to those visits was included in the non-identified medical records the University provided to Google as part of their research partnership.  A76-77.

On that basis, Dinerstein's amended complaint alleged claims against the University for breach of contract, breach of implied contract, and consumer fraud under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"); against Google for tortious interference with contract; and against both the University and Google for "intrusion upon seclusion" and unjust enrichment.  A78-91.  Dinerstein sought to bring those claims on behalf of a putative class of all persons whose data (without direct identifiers) was shared with Google, alleging that the amount in controversy was over $5 million and asserting jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d).  A53.

The district court dismissed the amended complaint in a detailed 46-page opinion.  With respect to the "intrusion upon seclusion" claim, the district court found that Dinerstein had Article III standing to raise it, even though Dinerstein did not allege that Google had ever attempted to identify *any* patient's data, much less his own, and Dinerstein did not dispute that Google was contractually prohibited from doing so.  A14-19.  The district court then proceeded to dismiss that claim on the merits.  It explained that Dinerstein—"[l]ikely recognizing that th[e] case law forecloses his ability to pursue" an intrusion-upon-seclusion claim—had "abandon[ed] his intrusion-upon-seclusion theory in his brief and trie[d] to reframe

8

it as a breach-of-confidentiality tort." A45.  But that maneuver did Dinerstein little good, since (as Dinerstein conceded) Illinois courts have never recognized a "breach of confidentiality" tort.  *Id.*  The district court therefore declined to "break new ground in state law" by creating a new common-law tort claim that the Illinois courts have never approved, *id.* (quoting *Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 596 (7th Cir. 2017)), and that the court deemed "unlikely" they would recognize here, A46.

With respect to Dinerstein's breach of contract claim, the district court considered it "a close call" whether Dinerstein had Article III standing, because his amended complaint failed to allege any "monetary loss or other concrete harm" from the purported breach.  A9.  The district court recognized that the Supreme Court's recent decision in *Thole v. U.S. Bank N.A.*, 140 S.Ct. 1615 (2020), "could be construed to mean that breach of contract, without monetary harm, does not confer standing," and that the dissent in *Thole* had read the majority opinion precisely that way.  A10.  But the district court declined to adopt that reading, holding instead that alleging a bare breach of contract without any accompanying concrete harm is sufficient to support Article III standing.  A9-14.

The district court then dismissed Dinerstein's breach of contract claim on the merits.  As to most of Dinerstein's breach of contract theories, it held that his allegations failed to show any actual breach of the parties' agreement, including his

9

allegations that the University failed to use "all efforts" to protect his privacy, failed to comply with certain HIPAA safe-harbor provisions, and failed to comply with state law. A23-26, 29-31, 34-35. As to two of Dinerstein's breach of contract theories—his assertion that the purported "sale" of medical data violated (1) the Notice and (2) the University's commitment to comply with federal law—the district court found that Dinerstein had plausibly alleged a breach of the University's contractual obligations, but that his breach of contract claim nevertheless failed as a matter of law because Dinerstein failed to allege any actual damages from that breach. A31-33, 35-36, 39-42. The district court likewise dismissed Dinerstein's implied contract claim, explaining that "an implied contract cannot coexist with an express contract on the same subject." A43 (quoting *Marcatante v. City of Chi.*, 657 F.3d 433, 440 (7th Cir. 2011)).

The district court dismissed Dinerstein's ICFA claim for lack of Article III standing, explaining that he had failed to allege any actual injury from the purported consumer fraud. A21-22. The district court also dismissed Dinerstein's tortious interference claim against Google for failing to allege that Google intentionally caused any purported breach, and dismissed his unjust enrichment claim for failure to allege any viable theory of liability. A43-44, 46.

Although the district court granted Dinerstein leave to again amend his complaint, A47, he declined to do so, and the district court therefore entered judgment against him. A1; *see* Dct.Dkt.87 (minute entry). This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly dismissed all of Dinerstein's claims. Dinerstein lacks Article III standing as to each of those claims, and they are meritless in any event.

Dinerstein's lead argument on appeal is that the district court erred by dismissing his purported claim for "breach of medical confidentiality"—a claim Dinerstein concedes (1) he never pled in his complaint and (2) the Illinois courts have never recognized. His belated attempt to assert that novel theory of liability is plainly meritless. In fact, Dinerstein has not even plausibly shown Article III standing with respect to this claim. His only basis for asserting that his privacy has been invaded rests on the purely speculative and theoretical possibility that Google *might* someday re-identify his medical information—something Google has explicitly and contractually committed that it will not do. That speculative conjecture is not sufficient to show any actual or imminent Article III injury in fact.

Even if Dinerstein could show standing, his claim fails on the merits. As Dinerstein concedes, there is no Illinois tort claim for "breach of medical confidentiality." It simply is not the place of federal courts sitting in diversity to

11

invent new state-law torts.  Even if it were, there would be no basis for adopting the unprecedented tort theory that Dinerstein advances here.  Contrary to what Dinerstein suggests, no other court has *ever* recognized an actionable tort claim on these facts: a disclosure of medical information scrubbed of patient identifiers, in the course of a research partnership, where the recipient has explicitly and contractually agreed not to re-identify any of that information (and has kept to that agreement).  There is likewise no merit to Dinerstein's request to certify this case to the Illinois Supreme Court, given that the correct outcome is clear and that Dinerstein voluntarily decided to file this lawsuit in federal court in the first instance.

The district court was equally correct to dismiss Dinerstein's breach of contract claim.  Indeed, because Dinerstein has not shown any concrete injury from the purported breaches, he does not even have standing to pursue that claim.  The bare violation of a purported legal right—absent any accompanying concrete harm—is not sufficient to create Article III standing.  Neither of the two purported theories of concrete harm that Dinerstein has advanced—that he "overpaid" for his medical services, or that he lost the "economic value" of his private information—is viable.  Both have been rejected by this Court under comparable circumstances, and Dinerstein's factual allegations fail to make either theory plausible here.

Dinerstein's contract claim also fails on the merits.  As the district court explained (and as both this Court and the Illinois courts have repeatedly recognized),

12

actual damages are an essential element of any Illinois contract claim.  Dinerstein cannot evade pleading that required element of his claim, regardless of what remedy he seeks.  For the same reasons that Dinerstein's two theories of harm fail to plausibly show the concrete injury required for Article III standing, they likewise fail to plausibly show the actual damages required for an Illinois contract claim.  In addition, Dinerstein's allegations fail to show any actual breach of contract, and so his claim must be dismissed for that reason as well.

Dinerstein's ICFA claim fails for similar reasons.  Once again, Dinerstein has not plausibly alleged any concrete harm from the University's actions, and so he lacks Article III standing to even bring this claim.  *A fortiori*, Dinerstein has not plausibly alleged the "actual pecuniary loss" that the ICFA requires.  His allegations also do not show any fraud (let alone with particularity).  The district court properly dismissed all of Dinerstein's claims, and this Court should affirm.

## STANDARD OF REVIEW

This Court reviews a district court decision granting a motion to dismiss *de novo*.  *See, e.g.*, *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

## ARGUMENT

**I.    The District Court Correctly Dismissed Dinerstein's Purported "Breach of Medical Confidentiality" Claim.**

### A.    Dinerstein Fails to Show Article III Standing.

Dinerstein's lead argument on appeal is that the district court erred in dismissing his purported "breach of medical confidentiality" claim—a claim he never pleaded, and that neither Illinois nor any other jurisdiction has recognized on these facts.  Even before reaching its dubious merits, that claim fails at the threshold, because Dinerstein has not shown any actual or imminent harm to his privacy.  He therefore lacks Article III standing to raise his novel tort claim.

To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must show (1) an injury in fact that is (2) fairly traceable to the defendant's conduct and (3) likely to be redressed by a favorable judicial decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see, e.g.*, *Spokeo v. Robins*, 136 S.Ct. 1540, 1547 (2016); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," which at the pleading stage requires that the plaintiff "must 'clearly allege facts demonstrating' each element."  *Spokeo*, 136 S.Ct. at 1547 (ellipsis omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Dinerstein's purported "breach of medical confidentiality" claim fails to satisfy "the 'first and foremost' of standing's three elements": injury in fact.  *Id.*

14

(quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).  To satisfy

that constitutional requirement, "a plaintiff must show that he or she suffered 'an

invasion of a legally protected interest' that is 'concrete and particularized' and

'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 1548 (quoting *Lujan*,

504 U.S. at 560).  Mere "allegations of *possible* future injury are not sufficient" to

show injury in fact; instead the threatened future injury "must be *certainly

impending*."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (brackets

omitted, emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158

(1990)); *see id.* at 414 n.5 (requiring at least a "'substantial risk' that the harm will

occur"); *Whitmore*, 495 U.S. at 157-58 (claims premised on "speculation and

conjecture" are "insufficient to establish Art. III injury in fact"); *see also, e.g.*,

*Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016); *Remijas

v. Neiman Marcus Grp.*, 794 F.3d 688, 692-93 (7th Cir. 2015).

Dinerstein's allegations of a purported "breach of medical confidentiality"

here fail to meet that basic constitutional requirement.  Dinerstein does not (and

cannot) allege that the University has *actually* disclosed any identified private

information about him or anyone else to Google, or that Google has *actually* learned

any private information about him or anyone else.  A66 (acknowledging that the

medical records that the University shared had no patient identifiers).  Instead, the

only purported invasion of privacy that Dinerstein alleges—which his amended

complaint describes as an intrusion upon seclusion, not a novel claim for "breach of medical confidentiality"—is the hypothetical possibility that at some point in the future, despite explicitly agreeing not to do so, Google could theoretically take the data the University shared and use other information in its possession to re-identify patients, thereby "reveal[ing] intimate private details about their medical histories." A90.

That wholly speculative assertion of possible future harm comes nowhere near satisfying Article III. Despite devoting much of his complaint to alleging that Google's sophisticated technology made it "uniquely able" to re-identify medical records, *see, e.g.*, A50, A58-63, A68-76, Dinerstein nowhere alleges facts showing that Google has taken a single step to re-identify his medical records and discover private facts about his personal life, much less that any such re-identification is "*certainly impending.*" *Clapper*, 568 U.S. at 409. Quite the opposite: Google explicitly agreed by contract that it will *not* make any attempt whatsoever to re-identify any of those medical records. A104. That eliminates any "substantial risk" that the harm Dinerstein alleges will occur. *Clapper*, 568 U.S. at 414 n.5.[1]

---

[1] That contractual promise also obviously distinguishes *Lewert* and *Remijas*, where this Court found a substantial risk of future harm after data breaches allowed hackers to obtain private credit-card information. *See Lewert*, 819 F.3d at 966-67; *Remijas*, 794 F.3d at 692-94. While there is a "substantial risk" that a hacker will misuse stolen credit card information, *Remijas*, 794 F.3d at 693, there is no comparable substantial risk that Google will intentionally breach an explicit

The district court agreed that the purported "risk that Google may effectively re-identify" the data at issue was insufficient to support Article III standing. A18. But it nevertheless found—focusing on the purported "intrusion upon seclusion" claim that Dinerstein pleaded in his complaint, rather than the "breach of medical confidentiality" theory that he subsequently adopted—that Dinerstein had adequately asserted Article III injury by alleging the disclosure of medical records that (according to Dinerstein) were "not sufficiently anonymized." *Id.*; *see* A14-19. That analysis is incorrect. Insofar as Dinerstein based his purported injury on the potential risk that Google could theoretically re-identify his medical records, that risk is entirely speculative, and therefore insufficient to support standing. A18; *see Clapper*, 568 U.S. at 409; *supra* pp.14-16.

If Dinerstein instead believes that his privacy was invaded by the disclosure of medical information with direct identifiers removed *even if* that data is never re-identified, that novel theory—that disclosing information that *does not identify any individual* is an invasion of privacy—fails to state any cognizable Article III injury. As the district court explained, in reviewing whether a purported injury is sufficient to confer standing, courts "must consider whether 'the common law permitted suit in analogous circumstances.'" A15 (quoting *Groshek v. Time Warner Cable, Inc.*,

---

contractual agreement by re-identifying the medical information here, and Dinerstein does not even attempt to allege that Google intends to do so.

865 F.3d 884, 887 (7th Cir. 2017)); *see Spokeo*, 136 S.Ct. at 1549 (considering whether alleged harm "has traditionally been regarded as providing a basis for a lawsuit in English or American courts"). Here, while the common law permitted a plaintiff to sue for invasion of privacy based on the disclosure of *identified* private information "concerning his or her person," *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989), neither the district court nor Dinerstein cited any case allowing a plaintiff to claim an invasion of privacy based on the disclosure of information that on its face is not associated with any particular individual and has names and other direct identifiers removed.

That forecloses Dinerstein's purported claim of injury here. Neither Google nor anyone else reviewing the data the University shared would know one iota more *about Dinerstein* than they did before reviewing the data, because—as Dinerstein concedes—direct personal identifiers had been removed. A66; *see* A110-11. At most, a person reviewing those records would know that certain medical evaluations, diagnoses, or treatments associated with some unidentified patient had occurred— but would have no way of knowing from those records that the unidentified patient was Dinerstein. That is not a cognizable invasion of Dinerstein's privacy, any more than a hospital reporting the statistic that 35% of its patients have high blood pressure would invade the privacy of those unspecified 35% of its patients. Because

Dinerstein's allegations fail to show any actual or imminent injury, his "breach of medical confidentiality" claim must be dismissed for lack of Article III standing.[2]

### B. The District Court Correctly Refused to Create a New State-Law Tort of "Breach of Medical Confidentiality" on These Facts.

Even if Dinerstein could show standing to raise his purported "breach of medical confidentiality" claim, the district court correctly dismissed that claim on the merits. As Dinerstein concedes, he never pleaded a "breach of medical confidentiality" claim in his original complaint or his amended complaint. Br.6 n.1. Instead, Dinerstein pleaded a distinct claim for "intrusion on seclusion." A89; *see* A44-45. In response to the University's and Google's motions to dismiss, and "[l]ikely recognizing that th[e] case law forecloses his ability to pursue this claim," he then "abandon[ed] his intrusion-upon-seclusion theory in his [district court] brief and trie[d] to reframe it as a breach-of-confidentiality tort." A45. That maneuver was not only procedurally improper, *see, e.g.*, *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989), but did Dinerstein no good. As the district court recognized, and as Dinerstein acknowledges, the Illinois courts have never recognized any tort claim for "breach of [medical] confidentiality." A45; *see* Br.7,

---

[2]  Dinerstein likewise cannot show standing based on his conclusory allegation that he suffered "mental anguish and suffering" out of "concern for the safety of [his] medical records." A89. Just as a plaintiff "cannot manufacture standing merely by inflicting harm on [himself] based on [his] fears of hypothetical future harm that is not certainly impending," he also cannot premise standing on those "fears of hypothetical future harm" themselves. *Clapper*, 568 U.S. at 416.

12.  The district court therefore declined Dinerstein's invitation to invent a new state-law tort, and dismissed his allegations for failure to state a claim.  A45-46.

That decision was correct.  As this Court has routinely held, it is not the role of the federal courts to "break new ground in state law."  *Sabrina Roppo*, 869 F.3d at 596 (quoting *Lopardo v. Fleming Cos.*, 97 F.3d 921, 930 (7th Cir. 1996)); *see, e.g.*, *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007); *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 942 (7th Cir. 1986) ("[F]ederal court is not the place to press innovative theories of state law.").   "[F]ederal court pronouncements on the content of state law inherently involve a significant intrusion on the prerogative of the state courts to control that development," and so "risk interrupting the orderly development and authoritative exposition of state law." *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092 (7th Cir. 1999) (cleaned up).  As such, "[r]espect for state courts as the primary expositors of state law counsels restraint by federal court[s] in announcing new state law principles." *Gust K. Newberg Constr. Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir. 1987).

Precisely because "[f]ederal courts are loathe to fiddle around with state law," district courts "are encouraged to dismiss actions based on novel state law claims" rather than inventing new state-law tort theories.  *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000); *see, e.g.*, *Pisciotta*, 499 F.3d at 639-40; *Ry. Express*

20

*Agency, Inc. v. Super Scale Models, Ltd.*, 934 F.2d 135, 138 (7th Cir. 1991) (citing cases). Dinerstein ignores that settled rule, and the district court plainly did not err by following it—particularly when Dinerstein voluntarily chose to bring this case in federal rather than state court. *See Insolia*, 216 F.3d at 607 ("Innovative state law claims should be brought in state court."); *Anderson*, 801 F.2d at 942 ("[W]e take this occasion to remind that resident litigants who seek adventurous departures in state common law are advised to sue in state rather than federal court.").

Even if the district court (and this Court) were free to invent new state-law torts, Dinerstein's arguments for inventing a new "breach of medical confidentiality" tort here are unpersuasive. Dinerstein's primary basis for arguing that the Illinois courts would recognize his novel tort claim is to assert that other jurisdictions have done so, saying that "the tally is 15-1" in favor of his view. Br.8; *see* Br.10 (asserting his claim "is recognized by all but one of the state high courts to consider the issue"). That tally is flat wrong. In fact, *no* other court has ever recognized the tort claim that Dinerstein asserts: that a hospital breaches a duty of medical confidentiality by sharing *non-identified* medical records with a research partner who has explicitly agreed not to make any attempt to re-identify those records. There is no reason to think that the Illinois courts would choose to be the first to adopt that novel theory.

The cases that Dinerstein cites rely on a patchwork of theories, ranging from breach of implied contract, to medical malpractice, to breach of fiduciary duty, to a

specialized duty of confidentiality. *See* Br.11 (recognizing the "various theories" involved). But none of those cases comes anywhere near adopting the novel view that sharing *non-identified* medical information for research purposes is an actionable tort, especially where the party receiving information has contractually agreed not to re-identify that information. In fact, none of the cases on which Dinerstein relies involve sharing non-identified medical data for research purposes at all. Instead, those cases uniformly involve the disclosure of *identified* medical information about specific and named individual patients, often in ways obviously contrary to the patient's interests, under circumstances ranging from unusual to downright bizarre. *See, e.g.*, *Byrne v. Avery Ctr. for Obstetrics & Gynecology, P.C.*, 175 A.3d 1, 16-17 (Conn. 2018) (doctor revealed plaintiff's unredacted OB/GYN records in response to subpoena from plaintiff's child's father in paternity dispute); *Simonsen v. Swenson*, 177 N.W. 831, 832 (Neb. 1920) (hotel doctor revealed to staff that hotel guest had syphilis); *Runyon v. Smith*, 749 A.2d 852, 854 (N.J. 2000) (psychologist testified against patient regarding her alleged mental illness during child custody dispute); *Humphers v. First Interstate Bank of Oregon*, 696 P.2d 527, 535 (Or. 1985) (doctor revealed plaintiff's identity to daughter whom she had given up for adoption); *Schaffer v. Spicer*, 215 N.W.2d 134, 136 (S.D. 1974) (psychologist provided affidavit regarding plaintiff's condition to plaintiff's ex-husband in custody dispute); *Berry v. Moench*, 331 P.2d 814, 816-17 (Utah 1958) (doctor disclosed

plaintiff's psychiatric treatment to family whose daughter was considering marrying plaintiff); *Lawson v. Halpern-Reiss*, 212 A.3d 1213, 1217-18 (Vt. 2019) (nurse disclosed to police that plaintiff was intoxicated, had driven to the hospital, and intended to drive home).[3]   None of those cases remotely suggest that it is an actionable tort to share medical data with no direct patient identifiers for research purposes—especially where the party whose data was shared *agreed* that his data could be shared for research and the party receiving the data explicitly agreed not to re-identify it.

Dinerstein cites only two Illinois cases in support of his argument, and neither is remotely on point.  *See* Br.10-12 (citing *Best v. Taylor Mach. Works*, 689 N.E.2d

---

[3]    *See also Mull v. String*, 448 So.2d 952, 953 (Ala. 1984) (doctor provided medical opinion letter about plaintiff to hospital in medical malpractice suit); *Vassiliades v. Garfinckel's*, 492 A.2d 580, 592 (D.C. 1985) (photographs of plaintiff's cosmetic surgery were used in promotional programs with plaintiff's former co-workers in the audience); *Gracey v. Eaker*, 837 So.2d 348, 354 (Fla. 2002) (psychotherapist treating couple revealed information learned from one spouse to the other); *Alberts v. Devine*, 479 N.E.2d 113, 120 (Mass. 1985) (doctor disclosed information about plaintiff to his employer and plaintiff lost his job); *Brandt v. Med. Def. Assocs.*, 856 S.W.2d 667, 670-71 (Mo. 1993) (doctor in medical malpractice dispute spoke with other physicians, hospital, and insurer regarding plaintiff's condition); *Biddle v. Warren Gen. Hosp.*, 715 N.E.2d 518, 523 (Ohio 1999) (attorney convinced hospital to forward all patient registration forms so that law firm could contact patients to encourage them to apply for Social Security benefits); *Fairfax Hosp. v. Curtis*, 492 S.E.2d 642, 645 (Va. 1997) (hospital provided medical records of deceased child to attorney and treating nurse in response to notice of medical malpractice claim); *Morris v. Consolidation Coal Co.*, 446 S.E.2d 648, 657 (W. Va. 1994) (physician treating plaintiff for alleged work-related injuries disclosed information to plaintiff's employer).

1057 (Ill. 1997) and *Petrillo v. Syntex Labs., Inc.*, 499 N.E.2d 952 (Ill. App. 1986)). In *Petrillo*, the Illinois Appellate Court held that a lawyer can be held in contempt for violating a court order to refrain from *ex parte* communications with an opposing party's physician.   499 N.E.2d at 954-55.   In *Best*, the Illinois Supreme Court rejected a legislative attempt to overrule *Petrillo* by requiring personal-injury plaintiffs to disclose their full medical records.   689 N.E.2d at 1089-91, 1096-100. Nothing in either opinion suggests that a plaintiff can assert an actionable tort claim against a physician for disclosing medical information.   In fact, both opinions specifically *declined* to recognize such a claim.   *Id.* at 1100 n.13 ("We do not, however, create a broad-based remedy for perceived violations of a person's privacy interests by private parties."); *Petrillo*, 499 N.E.2d at 962 n.3 (noting, "without deciding," that other jurisdictions recognized such a claim).   Even if those opinions could be read to support inventing a new tort claim for disclosure of *identified* medical information, they cannot be read to support inventing a new tort claim for disclosure of *non-identified* medical information, particularly when the information is disclosed for research purposes and the recipient has agreed not to re-identify it. And that is hardly surprising, given the dramatic chilling effect that inventing this novel tort claim would have on commonplace medical research techniques that rely on analyzing large sets of non-identified patient data to improve healthcare outcomes.

In short, no court has ever recognized the novel common-law tort that Dinerstein asks this Court to create. There is no plausible reason to think the Illinois courts would adopt it, and even less reason for a federal court sitting in diversity to undertake that "adventurous departure[] in state common law" in the Illinois courts' place. *Anderson*, 801 F.2d at 942. The district court thus properly dismissed Dinerstein's purported "breach of medical confidentiality" claim.

### C. There Is No Good Reason to Certify This Case to the Illinois Supreme Court.

For much the same reasons, there is no merit to Dinerstein's request to certify this case to the Illinois Supreme Court. As this Court has repeatedly explained, the "most important consideration" in deciding whether to certify is whether this Court "finds itself genuinely uncertain about a question of state law that is vital to a correct disposition of the case." *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 635 (7th Cir. 2020) (quoting *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 671 (7th Cir. 2001)); *see, e.g.*, *Vill. of Bedford Park v. Expedia, Inc.*, 876 F.3d 296, 302 (7th Cir. 2017); *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 466 (7th Cir. 2014). For the reasons already noted, there is no genuine uncertainty as to how the Illinois Supreme Court would resolve this case, given that *no* jurisdiction has ever recognized an actionable tort claim under the circumstances presented here. *Supra* pp.21-24; *see also Insolia*, 216 F.3d at 607 (courts "simply cannot certify every creative but unlikely state cause of action that litigants devise from a blank slate.").

25

Nor, moreover, is the question "vital to a correct disposition of the case," because Dinerstein would still lack Article III standing and so his claim would have to be dismissed in any event. *H.A.L.*, 958 F.3d at 635; *see supra* pp.14-19.

Other relevant considerations also weigh strongly against certification. Certification "is costly and burdensome," *Bedford Park*, 876 F.3d at 302, not only for the litigants but also for "the state court which already must contend with a crowded docket of its own." *Pate*, 275 F.3d at 671. As such, this Court "approach[es] the decision to certify with circumspection." *Id.* That circumspection is especially warranted here, as Dinerstein voluntarily chose to file this case in federal rather than state court. If Dinerstein "genuinely wanted the views of the state judiciary," he "should have brought [his] action in state court" in the first place. *Am. Safety Cas. Ins. Co. v. City of Waukegan*, 678 F.3d 475, 481 (7th Cir. 2012) (denying certification); *see also, e.g.*, *Brown v. Argosy Gaming Co., L.P.*, 384 F.3d 413, 417 (7th Cir. 2004). Dinerstein also cites no other case in Illinois or any other jurisdiction attempting to raise a tort claim based on the disclosure of non-identified information, much less for research purposes, belying his assertion that the issue is likely to recur. *Contra* Br.14-15. In sum, there is no persuasive reason to delay resolution of this case by asking the Illinois Supreme Court to decide whether to recognize a novel tort claim that Dinerstein never pleaded in his amended complaint, that no other

26

jurisdiction has ever recognized on these facts, that Dinerstein chose to bring in federal court, and that he lacks standing to assert.

## II. The District Court Correctly Dismissed Dinerstein's Breach of Contract Claim.

The district court was likewise correct to dismiss Dinerstein's breach of contract claim. Dinerstein again lacks Article III standing to bring that claim, and the claim is meritless in any event.[4]

### A. Dinerstein Fails to Show Standing.

Like his allegations in support of his purported "breach of medical confidentiality" claim, Dinerstein's allegations in support of his breach of contract claim fail to show any injury in fact. The problem with Dinerstein's contract claim, however, is not that the injury he asserts is too speculative; it is that he does not plausibly assert any concrete injury from the alleged breach of contract *at all*. *See* A9 (explaining that Dinerstein argues he can bring a breach of contract claim without showing *any* "concrete harm"). While the district court noted that there is some "authority on both sides of the issue," *id.*, the better view is that a bare breach of contract alone, without any resulting concrete harm, is not sufficient to show an Article III injury in fact.

---

[4]    Dinerstein does not challenge the district court's decision to dismiss his breach of implied contract or unjust enrichment claims. A42-43, 46.

### 1. Article III requires concrete harm, not just the violation of an abstract legal right.

Under established Supreme Court precedent, Article III requires an injury in fact to be "concrete." *Thole*, 140 S.Ct. at 1618; *see, e.g.*, *Spokeo*, 136 S.Ct. at 1548-50; *Driehaus*, 573 U.S. at 158; *Lujan*, 504 U.S. at 560. To meet that standard, the alleged injury "must be 'de facto'; that is, it must actually exist." *Spokeo*, 136 S.Ct. at 1548 (emphasis omitted). The requirement that an injury in fact be "concrete" conveys "the usual meaning of the term—'real,' and not 'abstract.'" *Id.* While an injury in fact need not be tangible, a plaintiff cannot satisfy Article III by alleging a legal violation "divorced from any concrete harm." *Id.* at 1549; *see Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("Abstract injury is not enough.").

Those principles make clear that Dinerstein lacks Article III standing to bring his breach of contract claim here. As the district court recognized, Dinerstein has not plausibly alleged any "monetary loss or other concrete harm" from the purported breach of contract here. A9. That should have been the end of the matter. Absent some plausible allegation of "concrete harm," *id.*, a plaintiff by definition cannot meet the standing requirements of Article III and so cannot litigate his claim in federal court. *Spokeo*, 136 S.Ct. at 1548-50. A bare breach of contract, unaccompanied by any concrete harm, is precisely the kind of "[a]bstract injury" that "is not enough" to satisfy Article III. *O'Shea*, 414 U.S. at 494.

The district court nevertheless held that Dinerstein could assert Article III standing based solely on an alleged abstract violation of his contractual rights, even if he suffered no resulting concrete harm. A9; *see* A14 (finding the mere allegation that the University "breached an express contract" was "sufficient for Article III standing purposes," even without any allegation of further injury). In reaching that holding, the district court relied primarily on one of this Court's pre-*Spokeo* decisions, which appears to have adopted that view. *See* A10-11 (discussing *J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 650-51 (7th Cir. 2014)). But as the district court recognized, that decision is "in some tension" with this Court's other precedents, including cases where this Court either held or suggested that certain breach of contract allegations were insufficient to establish standing. A11-12 (discussing *Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015); *Lewert*, 819 F.3d at 968; *Remijas*, 794 F.3d at 694-95).

More important, the district court's interpretation of *J.P. Morgan* conflicts with the Supreme Court's more recent decisions in *Spokeo* and *Thole*. *Spokeo* unequivocally holds that Article III standing "requires a concrete injury," not just the violation of an alleged legal right. 136 S.Ct. at 1549 (rejecting the view that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right"). And *Thole* makes clear that the same "concrete injury" requirement applies even when the alleged legal right is a substantive one,

29

like the purported contract obligations here or the duties of loyalty and prudence at issue in *Thole*. 140 S.Ct. at 1616-18; *see Smith v. GC Servs. Ltd. P'ship*, 986 F.3d 708, 710 (7th Cir. 2021) (reiterating that "injury in fact is essential to standing, whether the asserted violation is best understood as substantive or procedural"); *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020) (recognizing that *Thole* involved a substantive right). Indeed, *Thole* itself almost resolves the question here: after explaining that a defined-benefit plan "is more in the nature of a contract," it held that plaintiffs who were plan participants lacked standing to challenge alleged mismanagement of the plan's investments, despite their claim that the defendants had breached their quasi-contractual duties. 140 S.Ct. at 1620; *see id.* at 1630 (Sotomayor, J., dissenting) (noting that under the majority's view, the plan "confers contractual rights to loyal and prudent plan management"). Because those plaintiffs "d[id] not have a concrete stake in this suit"—despite alleging a breach of the defendants' quasi-contractual obligations—they had no Article III standing. *Id.* at 1620 (majority opinion).[5]

---

[5] Those holdings were not affected by *Uzuegbunam v. Preczewski*, No. 19-968, 2021 WL 850106 (U.S. Mar. 8, 2021). In *Uzuegbunam*, the Supreme Court held that nominal damages satisfy the *redressability* requirement for Article III standing, without addressing the showing required to satisfy the *injury* requirement (at issue here). *Id.* at *3. The Court noted that some common-law courts held that "every legal injury necessarily causes damage," *id.* at 4 (emphasis omitted), but specifically declined to hold that a legal injury would automatically satisfy the Article III injury

This Court's post-*Spokeo* (and post-*Thole*) cases support the same result, unanimously recognizing the same basic principle of Article III standing: "No harm, no foul." *Smith*, 986 F.3d at 710; *see Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 331 (7th Cir. 2019) (Barrett, J.) (same); *see also, e.g.*, *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 286 (7th Cir. 2020) (rejecting argument that the "alleged violation is enough—by itself—to establish a concrete injury necessary for standing"); *Nettles v. Midland Funding LLC*, 983 F.3d 896 (7th Cir. 2020); *Gunn v. Thrasher, Buschmann & Voelkel, P.C.*, 982 F.3d 1069 (7th Cir. 2020); *Brunett*, 982 F.3d at 1068-69; *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1066-67 (7th Cir. 2020); *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909 (7th Cir. 2017); *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724 (7th Cir. 2016).

This Court has held, for instance, that the mere receipt of an incomplete debt-collection letter does not create Article III standing, even where the plaintiff has a right to a complete letter. *Casillas*, 926 F.3d at 331-32. So too for the mere receipt of a false or misleading debt-collection letter, even where the plaintiff has a right to an accurate letter. *Spuhler*, 983 F.3d at 286; *Nettles*, 983 F.3d at 899-900; *Gunn*, 982 F.3d at 1072; *Brunett*, 982 F.3d at 1068-69; *Larkin*, 982 F.3d at 1065-67. So too for the mere failure to delete personal information, even when the plaintiff has a right to

---

requirement, *see id.* at *7 & n.*—presumably because that holding would have required overruling *Spokeo*, *Thole*, and countless other cases.

have that information deleted. *Gubala*, 846 F.3d at 911-12. So too for the mere failure to truncate a credit card expiration date on a printed receipt, even where the plaintiff has a right to have that date truncated. *Meyers*, 843 F.3d at 727-29.

To be sure, the plaintiffs in each of those cases asserted statutory rights rather than contractual ones. Nothing in the logic of those opinions, however, turned on that fact. A plaintiff with a contractual right to receive a complete and accurate debt-collection letter, or to have personal information deleted, or a credit card expiration date truncated, is just as required to show concrete harm in order to sue in federal court as a plaintiff with equivalent statutory rights. Regardless of the source of the legal right that the plaintiff asserts, the principle is the same: the mere purported violation of an abstract legal right, "divorced from any concrete harm," cannot satisfy Article III. *Spokeo*, 136 S.Ct. at 1549; *see, e.g.*, *Larkin*, 982 F.3d at 1066-67 (plaintiffs cannot invoke federal jurisdiction to litigate an alleged violation "that did not injure them in any concrete way"). Otherwise, any plaintiff plausibly alleging a contractual violation—no matter how abstract and unmoored from any actual injury—would automatically be entitled to claim Article III injury in fact. Especially in light of *Spokeo* and *Thole*, that is not an approach this Court should endorse.[6]

---

[6]    The district court also cited out-of-circuit cases that it believed "generally—albeit not universally—confirm[ed]" its view that a bare breach of contract without any concrete harm was sufficient to support standing. A13. But the fact that other courts have taken a relaxed view of the irreducible requirements of Article III is

### 2. Neither of the two theories on which Dinerstein relies is sufficient to show concrete harm.

To the extent Dinerstein argues—after convincing the district court that a bare breach of contract alone is sufficient to show standing—that he in fact suffered concrete harm from the purported breaches, his arguments are unpersuasive. As the district court correctly recognized, neither of the two purported economic injuries Dinerstein has asserted to support his contract claim is sufficient to show any actual damages. A40-42. For the same reasons, they are insufficient to support Article III standing.

First, Dinerstein argues he was injured by losing "the amount of money he paid the University for the promise of confidentiality that was not kept." Br.20; *see* Br.20-24. But as this Court has twice explained, it has accepted such "overpayment" allegations as a plausible basis for Article III standing "only where the product itself was defective or dangerous and consumers claim they would not have bought it (or paid a premium for it) had they known of the defect." *Lewert*, 819 F.3d at 968; *see Remijas*, 794 F.3d at 694-95. There is especially good reason to again be "skeptical" of that overpayment theory here, and to decline "to push [it] beyond its current scope." *Lewert*, 819 F.3d at 968. Dinerstein does not allege that the medical services he received from the University were themselves "defective or dangerous." *Id.* And

---

hardly a reason for this Court to do the same. *See, e.g.*, *Casillas*, 926 F.3d at 335-36 (explicitly rejecting the Sixth Circuit's more lenient approach to injury in fact).

despite a few conclusory allegations to the contrary, *see* Compl. ¶¶112, 121, A80-82, he puts forward no facts plausibly showing that he would have declined to seek medical care from the University if he had understood that his anonymized medical records could be shared for research purposes (as the Notice and Agreement specifically explained, *see* A93, A97).

As in *Lewert* and *Remijas*, there is every reason to reject Dinerstein's implausible assertion that "patronizing [the University] inflicted injury on [him]" because he "would have shunned [the University] had [he] known that it did not take the necessary precautions to secure [his] data." *Remijas*, 794 F.3d at 695; *see Lewert*, 819 F.3d at 968. Dinerstein's conclusory assertions that he would not have paid for his medical care if he had known his records (with direct identifiers removed) might be used for medical research—assertions that defy the plain terms of the Notice and Authorization he received, *see* A93, A97—cannot carry his burden to plausibly allege a concrete injury in fact.

Dinerstein has no persuasive response. Rather than beginning with this Court's precedent in *Lewert* and *Remijas*, he opens with a variety of out-of-circuit (and mostly unpublished) district court cases that he claims support his position. Br.20-22. But as Dinerstein concedes (and the district court likewise recognized), the district courts are split on this issue. Br.23; A41; *see, e.g.*, *Attias v. CareFirst, Inc.*, 365 F.Supp.3d 1, 12-13 (D.D.C. 2019); *Khan v. Children's Nat'l Health Sys.*,

188 F.Supp.3d 524, 533 (D. Md. 2016); *Engl v. Nat. Grocers by Vitamin Cottage, Inc.*, 2016 WL 8578252, at *3-4, *7 (D. Colo. Sept. 21, 2016); *Austin-Spearman v. AARP*, 119 F.Supp.3d 1, 13-14 (D.D.C. 2015).  In any event, the most persuasive precedent here is this Court's own, which is uniformly "dubious" of Dinerstein's "problematic" theory.  *Remijas*, 794 F.3d at 694-95; *see Lewert*, 819 F.3d at 968. Calling the relevant portions of *Remijas* and *Lewert* dicta does not make their reasoning any less persuasive.  *Contra* Br.24.  And nothing in *Remijas* or *Lewert* turned on the fact that the retailers there charged the same amount for credit card and cash payments—just as the University does not calibrate its fees for medical services based on the amount of medical information a patient provides.  *Contra* Br.24.[7]

Second, Dinerstein suggests he was injured by losing "the value of the information he provided to the University."  Br.20; *see* Br.25-30.  But the district court correctly rejected that basis for standing, explaining that Dinerstein "cited no authority supporting the proposition" that he had a "property interest in health data." A19.  On the contrary, as this Court has confirmed, under Illinois law medical records are "the property of the hospital rather than a patient," and so Dinerstein had no "value" in that medical information to lose.  *Young v. Murphy*, 90 F.3d 1225, 1236

---

[7]    As for the Eighth Circuit's pre-*Thole* decision in *Carlsen*, it adopts the theory that a breach of contract without concrete injury is sufficient to show standing, which is wrong for the reasons described above.  *See supra* pp.28-32; *contra* Br.24 (citing *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016)).

(7th Cir. 1996); *cf. Lewert*, 819 F.3d at 968 (criticizing plaintiffs' asserted "property right to their personally identifiable data"); *Remijas*, 794 F.3d at 695 (same).

Even if Dinerstein had some property interest in that medical information (which he does not), "his allegations do not support an inference that the value of that property has been diminished by the University's or Google's actions."  A20; *see Gubala*, 846 F.3d at 912-13 (rejecting a similar argument as "gibberish"). Dinerstein alleges no facts plausibly showing that his medical information lost value when the University shared data with Google, "particularly since the complaint does not suggest that [Dinerstein] could sell [his] personal information for value." *Remijas*, 794 F.3d at 695; *see Gubala*, 846 F.3d at 913 (plaintiff "hasn't been deprived of anything" by improper retention of his personal information).  To the extent Dinerstein attempts to rely solely on the assertion that the University benefited from sharing the information at issue with Google—as he appears to do, *see* Br.25-30—the law is clear that injury in fact "cannot be based solely on a defendant's gain; it must be based on a plaintiff's loss." A20 (quoting *Silha*, 807 F.3d at 174-75).  That is especially true here, given that Dinerstein expressly acknowledged in the Authorization that the University could use his medical information for research that "may have commercial value" and disclaimed "any compensation, regardless of the value of such research or any products or inventions developed therefrom."  A93.

Because Dinerstein has not shown any plausible concrete harm from the purported breaches he asserts, he lacks Article III standing for his breach of contract claim.

## B. The District Court Correctly Held That Dinerstein Failed to State Any Contract Claim Because He Failed to Allege Damages.

Dinerstein's problems are even worse on the merits. As the district court correctly concluded, even if Dinerstein has standing to raise his breach of contract claim, that claim fails as a matter of Illinois law because Dinerstein did not plausibly allege damages. A40-42. Dinerstein asserts two responses: that (1) Illinois law does not require damages for a breach of contract claim, and (2) he adequately alleged damages anyway. Both responses fail.

### 1. Illinois law requires damages to state a breach of contract claim.

First, the district court was entirely correct to hold that Illinois law requires a plaintiff to show damages in order to state a claim for breach of contract. As an initial matter, Dinerstein never raised any contrary argument below, so he has forfeited his new argument on appeal that damages are not an element of an Illinois breach of contract claim. *See, e.g.*, *Siddique v. Laliberte*, 972 F.3d 898, 905 (7th Cir. 2020) ("[A] party forfeits an argument not raised before the district court.").

In any event, Dinerstein is incorrect. As both this Court and the Illinois courts have repeatedly held, the "required elements of a breach of contract claim in Illinois are the standard ones of common law: '(1) offer and acceptance, (2) consideration,

(3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) *damages*.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (emphasis added) (quoting *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007)); *see, e.g.*, *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007); *Mosier v. Vill. of Holiday Hills*, 128 N.E.3d 1210, 1214 (Ill. App. 2019); *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. 2004) ("In order to plead a cause of action for breach of contract, a plaintiff must allege … resultant damages."). This Court's precedent is particularly clear on the point: "Merely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract." *TAS*, 491 F.3d at 631; *see, e.g.*, *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 540-41 (7th Cir. 2008).

Dinerstein's response is wholly unpersuasive. He leads with an opinion from this Court applying Minnesota (not Illinois) law. Br.16 (citing *Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887 (7th Cir. 1995)); *see TAS*, 491 F.3d at 631 n.6 (distinguishing *Hydrite*). He then attempts to buttress that authority with an unpublished (and nonprecedential) Illinois Appellate Court opinion, a district court decision, and (finally) an Illinois Supreme Court opinion on an entirely different topic. Br.16-17; *see Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d

1132, 1135 (Ill. 1995) (addressing when a contract action *accrues*, not what elements are required). Those cases come nowhere near disturbing the settled rule that Illinois law makes damages a necessary element of a breach of contract claim.

Dinerstein next cites cases showing that nominal damages are available as a remedy for breach of contract under Illinois law. Br.17. Of course, Dinerstein never mentioned nominal damages anywhere in his complaint or his briefing below. In any event, Illinois law on nominal damages is equally clear: they are available when a plaintiff has suffered *some* injury from a breach of contract, but fails to prove the amount of that injury with adequate certainty. *See, e.g.*, *Hentze v. Unverfehrt*, 604 N.E.2d 536, 540 (Ill. App. 1992); *see also Giammanco v. Giammanco*, 625 N.E.2d 990, 997 (Ill. App. 1993) (nominal damages are available "[i]f a party proves the right to damages but fails to provide a proper basis for computing those damages"). Unsurprisingly, this Court has already explicitly rejected the argument that a plaintiff can obtain nominal damages under Illinois law on a contract claim by "merely showing that a contract has been breached without demonstrating actual damages." *Prima Tek*, 525 F.3d at 540-41 (bracket omitted) (quoting *TAS*, 491 F.3d at 631).

For similar reasons, Dinerstein's discussion of injunctive relief is beside the point. *Contra* Br.18-19. Setting aside whether the injunctive relief Dinerstein requests would be appropriate here—and it plainly would not—Dinerstein cannot obtain that relief unless and until he pleads and proves an actionable contract claim,

which in turn requires pleading and proving *some* actual damage from the breach. *See, e.g.*, *Wigod*, 673 F.3d at 560; *Prima Tek*, 525 F.3d at 540-41; *TAS*, 491 F.3d at 631; *Mosier*, 128 N.E.3d at 1214. Indeed, in contract cases as in other cases, a plaintiff seeking injunctive relief must normally prove not just injury but, among other things, *irreparable* injury. *See, e.g.*, *Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 91 (Ill. 2006); Restatement (Second) of Contracts §359(1) (1981) (injunction "will not be ordered if damages would be adequate"). The handful of dated cases that Dinerstein cites for his purported contrary rule arise in the unique contexts of partnership agreements and real estate covenants and are inapposite.

### 2.     Dinerstein has failed to allege actual damages.

The district court likewise correctly concluded that Dinerstein failed to allege any actual damages. As explained above, Dinerstein asserts only two categories of purported damages for his contract claim: (1) his purported overpayment of "the amount of money he paid the University for the promise of confidentiality," and (2) his purported loss of "the value of the information he provided to the University." Br.20; *see* A40-42; *supra* pp.33-37. For much the same reasons that those purported damages are inadequate to show standing, *see supra* pp.33-37, they are *a fortiori* inadequate to show actual damages to support an Illinois breach of contract claim.

First, the district court was correct to hold that Dinerstein's "overpayment" theory fails to plausibly state any actual damages. As the district court explained,

Dinerstein's claim that "some indeterminate amount of the price he paid for his treatments represents the cost of the University's privacy practices" is the same implausible theory that this Court criticized in *Lewert* and *Remijas*, and that numerous other courts have rejected, including the Illinois Appellate Court. A40-41; *see Lewert*, 819 F.3d at 968; *Remijas*, 794 F.3d at 694-95; *Lozada v. Advoc. Health & Hosps. Corp.*, 2018 IL App (1st) 180320-U, ¶32.[8] Dinerstein alleges no facts plausibly showing that the University specifically priced its privacy policy into the cost of the medical services it provided him, or that the University or any other provider would have sold him the same services without that privacy policy at a lower cost, or (beyond a few conclusory assertions) that he would have refused to pay for those services if he had realized that his medical data (with direct identifiers removed) might later be used for research, or that the services he received were worth less than what he paid. Compl. ¶¶112, 116, 121, A80-82 (conclusory allegations); *cf.* A93, 97 (Authorization and Notice informing Dinerstein that his records might be used for research). His "overpayment" theory therefore not only

---

[8]   *Lozada* is not, as Dinerstein suggests, premised solely on the doctrine of election of remedies. *Contra* Br.22-23. It squarely holds that the "'overpayment' theory of damages is not a cognizable measure of a breach of contract damages in Illinois," regardless of whether other remedies are sought. 2018 IL App (1st) 180320-U, ¶32.

fails to show Article III standing, but also fails to plausibly show actual damages under Illinois law.

So too for Dinerstein's theory that he suffered damage in the amount of the "economic value" of his medical information. *See* Br.25-30. As the district court explained, Dinerstein's allegations on this point do not plausibly show any cognizable damage to the purported "economic value" of his medical information. A19-20, A40; *see supra* pp.35-36. For the reasons the district court gave, Dinerstein's allegations do not show that he has any property interest in his medical records (and in fact, Illinois law shows the opposite). A19, A41 ("Plaintiff has not plausibly alleged that he has any such [property] right"); *see Young*, 90 F.3d at 1236. And for the reasons the district court also gave, even if Dinerstein had some property interest in his medical information, his allegations do not show the value of that property interest has been in any way diminished, and there is no plausible reason to think it would be diminished—particularly when Dinerstein explicitly acknowledged in the Authorization that he would have no right to any compensation for any research conducted using his medical information or any products or inventions developed therefrom. A20, A93; *see supra* pp.35-36.

Dinerstein makes no attempt to confront these fatal problems with his theory. Instead, he asserts only that he can seek to recover "disgorgement of profits" or a "reasonable royalty" for the University's alleged breach. Br.25-30. That argument

entirely misses the mark.  Disgorgement and reasonable royalties are not alternative means of showing damages; they are potential *remedies* that, under certain circumstances (not present here), a plaintiff may be able to recover *once damages are shown*.  *See, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment §39 cmt.a (2011) (disgorgement is "an *alternative remedy* for breach, potentially available to an injured party *who might otherwise enforce the contract by an action for damages*" (emphasis added)).  While those remedies may be available if the amount of actual damages is difficult to calculate, *see id.*, they are not available where (as here) a plaintiff fails to plausibly plead damages *at all*.  Dinerstein cannot use those alternative remedies to excuse his failure to plead one of the "required elements" of his claim.  *Wigod*, 673 F.3d at 560.

Dinerstein's allegations also do not show any plausible claim for either disgorgement or a reasonable royalty.  As to disgorgement, Dinerstein never argued below that he could rely on that remedial theory to prove damages, and so that argument is forfeited.  *Siddique*, 972 F.3d at 905.  Regardless, it is not at all clear what "disgorgement" Dinerstein wants.  The only purported "profits" that Dinerstein claims the University received from its research was a nonexclusive license to use any resulting trained models and predictions for internal, non-commercial research purposes, A105, and Dinerstein did not plead or ever suggest that there ever were any ensuing profits (there were not).

43

As to a reasonable royalty, here as below, Dinerstein "has not cited … any Illinois cases in which a reasonable royalty was awarded or considered an appropriate remedy for breach of contract."  A42; *see Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 347 (6th Cir. 2018) ("[N]o controlling authority … holds that damages in the form of a reasonable royalty may be assessed in a breach of contract case.").  Dinerstein's strained analogy to misappropriating construction equipment, Br.29—which is a tort, not a breach of contract—only underscores the unprecedented nature of his claim, and the wisdom of this Court's admonition that "federal court is not the place to press innovative theories of state law."  *Anderson*, 801 F.2d at 942.

## C.    Dinerstein Also Failed to Allege Any Actual Breach.

This Court should also affirm the dismissal of Dinerstein's breach of contract claim because his allegations fail to show any actual breach of the University's contractual obligations.  *See Kidwell v. Eisenhauer*, 679 F.3d 957, 965 n.1 (7th Cir. 2012) ("[W]e may affirm on any basis that appears in the record.").  Neither of the two purported breaches on which the district court relied is an accurate reading of the University's contractual obligations, and neither are the two alternative breaches that the district court rejected but that Dinerstein attempts to resurrect on appeal.[9]

---

[9]    This Court reviews the district court's interpretation of a contract *de novo*. *BKCAP, LLC v. CAPTEC Franchise Tr. 2000-1*, 572 F.3d 353, 358 (7th Cir. 2009).

44

First, the district court found that Dinerstein had plausibly pled breach of a contractual obligation under the Authorization to comply with the terms of the Notice, which states that the University will obtain written permission before any "sale of your medical information." A35 (quoting A98). According to the district court—relying on an argument Dinerstein never raised—this language must be understood as imposing a "stricter requirement" than the already-stringent requirements imposed by HIPAA, because otherwise the University's commitment in the Authorization to comply with the Notice would be "mere surplusage" given that the University "also promises to comply with federal law [including HIPAA]." A35-36.

The district court's interpretation misconstrues HIPAA and misunderstands the function of the Notice. The Notice is not a voluntary additional undertaking by the University separate from its HIPAA obligations; instead, the Notice is itself *required* by HIPAA and its implementing regulations, which require covered entities to provide a written notice describing "in plain language" the uses of patient information permitted under applicable law. 45 C.F.R. §164.520(b)(1). That is, the very purpose of the Notice (as dictated by HIPAA) is to restate, in simpler language, the protections that HIPAA provides.

In particular, HIPAA requires the Notice to restate in plain language HIPAA's requirement that a covered entity obtain authorization before engaging in a sale of

patient information. *See id.* §164.520(b)(1)(ii)(E) (requiring description of specific uses that require authorization, including sale under 45 C.F.R. §164.508(a)(4)). In this context, the district court's reliance on the canon against surplusage is misplaced. The University's commitment in the Authorization to follow both "federal and state laws … and the [Notice]," A93, does not imply that the obligations imposed by federal law and the Notice are different; instead, it simply reflects the fact that HIPAA requires the University to restate in plain language in the Notice the protections that HIPAA mandates. 45 C.F.R. §164.520(b)(1).

The district court's holding that the term "sale" in the Notice imposes stricter obligations than HIPAA is particularly problematic in light of the federal government's own guidance. The federal government has issued a model Notice of Privacy Practices—and that model likewise informs patients that there will be no "[s]ale of your information" without written permission. *Notice of Privacy Practices* 4, https://bit.ly/3cpNN2L (last accessed Mar. 15, 2021); *see* Dep't of Health & Human Servs., *Model Notices of Privacy Practices*, https://bit.ly/3tcV3G7 (last accessed Mar. 15, 2021). Under the district court's reasoning, every hospital that agrees to comply with federal law and the federal government's model notice has inadvertently agreed to different and stricter restrictions than HIPAA itself imposes. That result cannot be sustained. Instead, the term "sale" in the Notice, like the same term in the federal government's model notice, simply paraphrases—"in plain

46

language," as HIPAA requires, 45 C.F.R. §164.520(b)(1)—the same restrictions that are imposed by the term "sale" in HIPAA itself. *See* 45 C.F.R. §164.520(b)(1)(ii)(E). Because Dinerstein has not plausibly alleged that the University engaged in any "sale" prohibited by HIPAA, *see infra* pp.47-48, he also has not plausibly alleged any violation of the terms of the Notice.

Second, and relatedly, the district court erred in concluding that Dinerstein plausibly alleged that the University breached its commitment to comply with federal law (namely, its HIPAA obligations) by engaging in an unauthorized "sale of protected health information" under HIPAA. A31-33; *see* 45 C.F.R. §§164.502(a)(5)(ii), 164.508(a)(4). HIPAA defines a "sale of protected health information" as "a disclosure of protected health information by a covered entity [that] directly or indirectly receives remuneration from or on behalf of the recipient of the protected health information in exchange for the protected health information." 45 C.F.R. §164.502(a)(5)(ii)(B)(1). Contrary to the district court's view, that definition plainly does *not* include what occurred here: a joint research project in which the University and Google partnered to develop innovative, cutting-edge healthcare models to improve patient outcomes. *See* A106, A110 (describing the University and Google's research plans and intent to "collaborate on a joint publication" of their research); *see also* A6 (discussing the resulting publication). In that context, the University's non-exclusive license to use any resulting trained

47

models and predictions—solely for internal, non-commercial research purposes—cannot plausibly be described as "remuneration" for the non-identified medical records it contributed, just as a scientist who shares the results of a joint project with a colleague cannot plausibly be described as providing "remuneration" for his colleague's contributions. *Contra* A32. Nothing in HIPAA or its implementing regulations, which specifically *permit* the use of medical information for research projects, *see, e.g.*, 45 C.F.R. §164.512(i), suggests that those research projects become impermissible if they involve two people or entities working together and sharing access to the results. *Contra* A31-33.[10]

For similar reasons, Dinerstein's contract claim also fails for lack of consideration. Under Illinois law, "consideration cannot flow from an act performed pursuant to preexisting legal duty," including the University's duties under HIPAA here. A37 (quoting *Marque Medicos Fullerton, LLC v. Zurich Am. Ins. Co.*, 83 N.E.3d 1027, 1044 (Ill. App. 2017)). The district court's only reason for holding that Dinerstein had plausibly alleged consideration was its mistaken belief that the

---

[10] Even if "sale" had a different meaning under the Notice than under HIPAA, the correct meaning would be its "plain, ordinary, and popular meaning," *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011): a transfer of property for money. *See* A33 ("traditional" definition of sale "involves a payment of money"); *sale*, Black's Law Dictionary (11th ed. 2019) ("[t]he transfer of property or title for a price," whose elements include "a price in money paid or promised"). That ordinary meaning once again plainly excludes what happened here: a joint research project resulting in a nonexclusive license for internal research purposes.

Notice was "more stringent" than HIPAA and "went beyond [the University's] obligations under federal law." A38-39. Because the Notice explains in plain language the University's preexisting duties under HIPAA, as HIPAA itself expressly requires, *see* 45 C.F.R. §164.520(b)(i), Dinerstein's contract claim must therefore be dismissed for failure to allege facts showing the necessary element of consideration.

Apparently recognizing the weakness of the two theories that the district court accepted, Dinerstein attempts to resurrect on appeal two theories of breach that the district court rejected.[11] Those attempts are equally unavailing.

To begin, the district court correctly found that Dinerstein failed to plausibly allege any other breach of HIPAA beyond the purported "sale" of his (non-identified) medical information. A29-31; *contra* Br.30-33. As the district court explained, in order to state a viable claim, the burden was on *Dinerstein* to plead facts plausibly showing that the University's disclosure violated the relevant HIPAA regulations— *i.e.*, that the disclosure did not fall within any of the regulatory safe harbors. A30. Absent facts showing that those safe harbors did not apply, Dinerstein's bare allegation that the University disclosed certain information is "merely consistent

---

[11] Dinerstein does not attempt to revive his theory below that the University breached its obligations by failing to use "all efforts" to protect his privacy. *See* A22-26.

with" liability, and so "stops short of the line between possibility and plausibility."
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007); *see Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) (facts that "are 'merely consistent with' a defendant's liability"
are insufficient).[12]

Here, Dinerstein's allegations do not merely *fail to exclude* the "obvious
alternative explanation" of appropriate disclosure under HIPAA's exceptions,
*Twombly*, 550 U.S. at 567; they *affirmatively support* two of those exceptions, either
of which is independently sufficient to defeat Dinerstein's claim. A30-31. HIPAA
allows the University to disclose a "limited data set" that excludes certain direct
identifiers enumerated in the regulation, if that disclosure is for research purposes
and the disclosure is made pursuant to a data use agreement. A29 (citing 45 C.F.R.
§164.514(e)). As the district court correctly found, A30-31, Dinerstein's own
allegations, and the documents incorporated by reference in his complaint, show that
those requirements were met here: the University disclosed a "limited data set"
excluding the specified identifiers, *see* A66-67, A103, A110-11, for research
purposes, *see* A49, A65, A110, pursuant to a qualifying data use agreement, A67,
A102-11.

---

[12]   Dinerstein is again wrong to assert that "the University would ultimately need
to establish" that these regulatory exceptions apply. *Contra* Br.31. As the district
court explained, proving breach (by showing that these exceptions do not apply) is
an element of Dinerstein's claim, not an affirmative defense. A30. Dinerstein does
not meaningfully contest the district court's analysis on this issue.

Dinerstein's only response is to note his allegation that the data that the University shared was not "sufficiently anonymized," because it included "free-text notes in which doctors and nurses can write whatever they want." Br.32; *see* A66-67. But the DUA, incorporated by reference in Dinerstein's complaint, confirms that any free-text notes "have gone through [a] deidentification process to remove identifiers except for dates of service" (which are permitted under 45 C.F.R. §164.514(e)), A111, and Dinerstein does not (and cannot) allege that any identifiers prohibited under 45 C.F.R. §164.514(e) were included in the shared data set. His vague and conclusory allegation that (in his view) the data set was not "sufficiently anonymized" fails to plausibly show any HIPAA violation.

Dinerstein's allegations also affirmatively support the waiver of authorization provision under HIPAA allowing disclosure for research approved by an Institutional Review Board ("IRB") so long as the recipient has made specified representations about its use of the data. 45 C.F.R. §164.512(i)(1)(i); *see* A29. As the district court explained, "documents referenced in the pleading confirm that the disclosure met those requirements as well," and so Dinerstein's allegations do not state a plausible HIPAA violation. A31 (citing *Twombly*, 550 U.S. at 557). Dinerstein's only response is to suggest that the University's IRB process could conceivably have been flawed. Br.31-32. His complaint, however, alleges no facts whatsoever to support

that conclusion. The district court correctly concluded that Dinerstein failed to adequately allege any HIPAA violation on this basis.

Finally, the district court also correctly concluded that Dinerstein failed to plausibly allege facts showing that the University breached its commitment to comply with state law. A34-35. Illinois law requires prior patient consent for any "research program," meaning (as relevant here) any research "involving medical, surgical, manipulative, or psychiatric diagnosis or treatment of human subjects who are inpatients or outpatients of a hospital and who are subjects at risk." A34 (quoting 77 Ill. Admin. Code §250.130(b)(1)(B)). As the district court explained, the University's joint research project with Google—which simply applied machine-learning techniques to non-identified health records—did not involve diagnosis or treatment of any human subjects, and so is not covered by that definition. A34-35 ("diagnosis or treatment of human subjects" does not include "research on records concerning past diagnoses or treatments"). Contrary to what Dinerstein suggests, Br.34, the fact that doctors may *someday* use whatever models may be developed from the joint research project for *future* patient diagnosis and treatment does not mean that the computer programmers developing those models *today* are engaged in the "diagnosis or treatment of human subjects." 77 Ill. Admin. Code §250.130(b)(1)(B).

## III.    The District Court Correctly Dismissed Dinerstein's ICFA Claim.

Dinerstein's ICFA claim fails for many of the same reasons as his contract claim, and more.  Once again, his failure to plausibly allege any concrete harm means that he lacks Article III standing to raise this claim.  Moreover, his failure to plausibly allege any actual damages means that his claim fails on the merits, since (as Dinerstein concedes) the ICFA requires a plaintiff to show "actual pecuniary loss" in order to state a claim.  *Kim v. Carter's, Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1197 (Ill. App. 2008)); *see* Br.34.

### A.    The District Court Correctly Held That Dinerstein Lacks Standing.

First and foremost, the district court correctly held that Dinerstein lacks standing to bring his ICFA claim because he has not plausibly shown any actual injury.  While the district court incorrectly believed that Dinerstein could assert Article III standing for his *contract* claim even without showing any concrete harm, the district court recognized that Dinerstein could not raise his *statutory* ICFA claim without making that showing.  A21; *see, e.g.*, *Spokeo*, 136 S. Ct. at 1549.  Because none of Dinerstein's allegations plausibly showed that he suffered any concrete injury, the district court dismissed his ICFA claim for lack of standing.  A20-21.

Dinerstein nevertheless claims he did suffer actual damage because the purported fraud deprived him of the "benefit of h[is] bargain" by causing him "to pay more than the actual value of the property" he received—in particular, because

53

"he paid for medical treatment plus confidentiality but received only treatment." Br.35. But as the district court correctly recognized, that argument "merely restates the overpayment theory that was rejected in *Remijas* and *Lewert*." A21 (citations omitted). For the reasons this Court gave in those decisions, it is simply implausible to suggest that Dinerstein was injured because some unspecified amount of the price that he paid for the medical services he received was purportedly attributable to the (allegedly breached) privacy policies. *Lewert*, 819 F.3d at 968; *Remijas*, 794 F.3d at 694-95; *see supra* pp.33-35, 40-42. Again, that is especially true here, where Dinerstein does not allege any facts showing that the University specifically prices its privacy policy into the services it offers, or that either the University or other hospitals offer the same services without privacy protections at a lower price, or (beyond a few conclusory allegations) that he would not have sought medical treatment from the University if he had understood its privacy policies or that the medical services he received were in fact worth less than what he paid. *See supra* pp.33-35, 40-42; *cf.* Compl. ¶¶112, 116, 121, A80-82 (conclusory allegations).

Dinerstein alternatively asserts that he was injured by losing "the value of the personal information he provided to the University," which he again claims "can be remedied through disgorgement or reasonable royalty." Br.36. Dinerstein never raised this argument below in support of his ICFA claim, and so it is again forfeited. *Siddique*, 972 F.3d at 905. It also fails for the same reasons described above:

Dinerstein's allegations do not show any property interest in "the value of [his] personal information," or any plausible way in which this value would have been impacted by the University's research project. A19-20; *see supra* pp.35-36, 42; *Gubala*, 846 F.3d at 912-13; *Lewert*, 819 F.3d at 968; *Remijas*, 794 F.3d at 695; *Young*, 90 F.3d at 1236. Whatever remedies might be available if Dinerstein *had* shown concrete harm—and disgorgement and a reasonable royalty are not, *see supra* pp.43-44—those remedies cannot stand in under Article III as a *substitute* for showing concrete harm.

### B.    Dinerstein Also Failed to State Any Consumer Fraud Claim.

Once again, Dinerstein's problems are even worse on the merits. The ICFA requires a plaintiff to plead and prove "actual pecuniary loss." *Kim*, 598 F.3d at 365. In particular, when plaintiffs seek to show "actual pecuniary loss" by demonstrating that they were deprived of the benefit of their bargain, they must show that they paid "more than the actual value of the property" they received. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647-48 (7th Cir. 2019) (quoting *Kim*, 598 F.3d at 365). Thus, for instance, plaintiffs suing a chocolate company for putting empty space in its boxes failed to state an ICFA claim, because they failed to show the chocolate they received was defective or worth less than what they paid, or that they could have bought it for less. *Id.* at 648; *see Kim*, 598 F.3d at 365-66 (plaintiffs

alleging deceptive sale pricing failed to state ICFA claim because they failed to show the clothing they bought was worth less than what they paid).

The same problem dooms Dinerstein's ICFA claim. Like the plaintiffs in *Benson* and *Kim*, Dinerstein does not allege that the underlying medical services he received from the University were defective, or that he "could have shopped around and obtained a better price" for those services elsewhere. *Benson*, 944 F.3d at 648 (quoting *Kim*, 598 F.3d at 365-66). And while Dinerstein does add a conclusory allegation that those medical services were worth less than if the University had refrained from later using his medical information (with direct identifiers removed) in its research project, A81, he provides no facts plausibly supporting that conclusory allegation, or explaining how the quality of the medical services he received was in any way diminished. That conclusory allegation alone cannot save Dinerstein's ICFA claim. *See, e.g.*, *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Dinerstein's further argument that he suffered "actual damages" under the ICFA by losing "the value of the personal information he provided to the University," Br.36, fails for the reasons already given. *See supra* pp.35-36, 42. Dinerstein forfeited that argument by failing to raise it below, *see Siddique*, 972 F.3d at 905, and in any event his allegations fail to establish either a property interest in that information or any diminution in its value. *Supra* pp.35-36, 42. In fact, this Court

has already specifically rejected the view that the ICFA considers the loss of personal information sufficient to show actual damages. *Lewert*, 819 F.3d at 968-69; *Remijas*, 794 F.3d at 698.

Finally, even if Dinerstein had any viable theory of standing or actual damages, his ICFA claim would still fail on the merits. Nothing in his allegations plausibly shows that the University breached any aspect of its privacy commitments to its patients, or committed any other deceptive or unfair act. *See supra* pp.44-52. *A fortiori*, Dinerstein's complaint does not plead any fraud with the necessary particularity. Fed. R. Civ. P. 9(b); *see Pirelli Armstrong Tire Corp. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011).[13] Even accepting the facts alleged in Dinerstein's complaint as true, those allegations fail to show any violation of the University's legal and contractual obligations, much less that any such violation caused Dinerstein any actual harm. The district court therefore properly dismissed the amended complaint.

---

[13] Dinerstein's ICFA claim also fails as a matter of law because it is duplicative of his breach of contract claim. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 843-44 (Ill. 2005).

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

s/Brian D. Sieve
BRIAN D. SIEVE, P.C.
MICHAEL B. SLADE
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 862-2000
bsieve@kirkland.com
mslade@kirkland.com

C. HARKER RHODES IV
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
harker.rhodes@kirkland.com

*Counsel for Appellees The
University of Chicago and The
University of Chicago Medical
Center*

March 15, 2021

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2016, the brief contains 13,953 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

March 15, 2021

s/Brian D. Sieve
Brian D. Sieve

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Brian D. Sieve
Brian D. Sieve