No. 20-3134

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

**MATT DINERSTEIN**,
*Plaintiff-Appellant,*

**v.**

**GOOGLE, LLC, et al.**,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
For the Northern District of Illinois
Case No. 19 cv 04311
The Honorable Rebecca R. Pallmeyer

---

### PLAINTIFF-APPELLANT'S REPLY BRIEF

---

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
Alexander G. Tievsky
atievsky@edelson.com

EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

ARGUMENT ................................................................................................. 1

I.  Mr. Dinerstein Alleges that His Medical Records Were Not Anonymous ......................................................................................... 1

II.  Mr. Dinerstein Has Article III Standing ..................................... 5

    A.  The Disclosure of Mr. Dinerstein's Private Information is an Article III Injury ........................................................... 6

    B.  The Breach of a Contract with Mr. Dinerstein is an Article III Injury ..................................................................... 7

    C.  The Pecuniary Harm Suffered by Mr. Dinerstein is an Article III Injury ............................................................ 10

III.  The Illinois Supreme Court Would Likely Recognize the Tort of Breach of Confidence Here ........................................................ 14

IV.  Mr. Dinerstein States a Claim for Breach of Contract ........................... 18

    A.  The Agreement is Not Unenforceable for Lack of Consideration ....................................................................... 18

    B.  The Complaint Alleges Breaches of the Agreement ................ 20

    C.  The Complaint Need Not—But Does—Allege Economic Damages ............................................................................... 21

V.  Mr. Dinerstein Sufficiently Alleged a Consumer Fraud Act Violation .................................................................................... 25

VI.  Mr. Dinerstein Sufficiently Alleged Tortious Interference with Contract ..................................................................................... 25

CONCLUSION .......................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Aqua Dots Prods. Liability Litig.,*
    654 F.3d 748 (7th Cir. 2011)............................................................................... 11

*Best v. Taylor Mach. Works,*
    689 N.E.2d 1100 (Ill. 1997).......................................................................... 16, 17

*Bew v. City of Chicago,*
    252 F.3d 891 (7th Cir. 2001)............................................................................... 22

*Biddle v. Warren Gen. Hosp.,*
    715 N.E.2d 518 (Ohio 1999) .............................................................................. 15

*Birnbaum v. U.S.,*
    588 F.2d 319 (2d Cir. 1978) ............................................................................... 16

*Bryant v. Compass Grp. USA, Inc.,*
    958 F.3d 617 (7th Cir. 2020)................................................................................. 9

*Byrne v. Avery Ctr. for Obstetrics & Gynecology, P.C.,*
    175 A.3d 1 (Conn. 2018)..................................................................................... 15

*Carlsen v. GameStop, Inc.,*
    833 F.3d 903 (8th Cir. 2016)......................................................................... 11, 12

*Clapper v. Amnesty International USA,*
    568 U.S. 398 (2013)......................................................................................... 6, 7

*Coulter-Owens v. Time Inc.,*
    695 Fed. App'x 117 (6th Cir. 2017) ..................................................................... 6

*Fairfax Hosp. by & through INOVA Health Sys. Hosps., Inc. v. Curtis,*
    492 S.E.2d 642 (Va. 1997) ................................................................................. 15

*Fox v. Dakkota Integrated Sys., LLC,*
    980 F.3d 1146 (7th Cir. 2020).............................................................................. 6

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,*
    204 F.3d 149 (4th Cir. 2000)................................................................................ 7

*Giammanco v. Giammanco,*
    625 N.E.2d 990 (Ill. App. Ct. 1993) .................................................. 23

*Gubala v. Time Warner Cable, Inc.,*
    846 F.3d 909 (7th Cir. 2017) ........................................................... 6

*Hart v. Transit Mgmt. of Racine, Inc.,*
    426 F.3d 863 (7th Cir. 2005) ........................................................... 18

*Hively v. Ivy Tech Cmty. Coll. Of Indiana,*
    853 F.3d 339 (7th Cir. 2017) ........................................................... 22

*Humphries v. CBOCS W., Inc.,*
    474 F.3d 387 (7th Cir. 2007) ........................................................... 18

*Hyson USA, Inc. v. Hyson 2U, Ltd.,*
    821 F.3d 935 (7th Cir. 2016) ........................................................... 21

*In re Facebook, Inc. Internet Tracking Litig.,*
    956 F.3d 589 (9th Cir. 2020) ............................................... 6, 12, 13

*In re Horizon Healthcare Services. Inc. Data Breach Litigation*
    846 F.3d 625 (3rd Cir. 2017) ........................................................... 6

*James v. Lifeline Mobile Medics,*
    792 N.E.2d 461 (Ill. App. Ct. 2003) .................................................. 24

*JamSports & Ent., LLC v. Paradama Prods., Inc.,*
    360 F. Supp. 2d 905 (N.D. Ill. 2005) ............................................... 26

*J.P. Morgan Chase Bank, N.A. v. McDonald,*
    760 F.3d 646 (7th Cir. 2014) ................................................... 7, 8. 10

*Kuhns v. Scottrade, Inc.,*
    868 F.3d 711 (8th Cir. 2017) ........................................................... 8

*Lawson v. Halpern-Reiss,*
    212 A.3d 1213 (Vt. 2019) ............................................................... 14

*Lawson v. Sun Microsystems, Inc.,*
    791 F.3d 754 (7th Cir. 2015) ........................................................... 22

iii

*Leopold v. Levin,*
    259 N.E.2d 250 (Ill. 1970) ................................................................. 16

*Lewert v. P.F. Chang's China Bistro, Inc.,*
    819 F.3d 963 (7th Cir. 2016) .................................................... 7, 11, 12

*Lo v. Provena Covenant Med. Ctr.,*
    826 N.E.2d 592 (Ill. App. Ct. 2005) .......................................... 19, 20

*Marque Medicos Fullerton, LLC v. Zurich American Insurance Co.,*
    83 N.E.3d 1027 (Ill. App. Ct. 2017) ................................................ 20

*Olympia Hotels Corp. v. Johnson Wax Dev. Corp.,*
    908 F.2d 1363 (7th Cir. 1990) .......................................................... 22

*Petrillo v. Syntex Labs., Inc.,*
    499 N.E.2d 952 (Ill. App. Ct. 1986) ............................................... 16

*Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.,*
    525 F.3d 533 (7th Cir. 2008) ........................................................... 22

*Remijas v. Neiman Marcus Grp., LLC,*
    794 F.3d 688 (7th Cir. 2015) ................................................... *passim*

*Ross v. Creighton Univ.,*
    957 F.2d 410 (7th Cir. 1992) ........................................................... 14

*Rumford v. Countrywide Funding Corp.,*
    678 N.E.2d 369 (Ill. App. Ct. 1997) ............................................... 25

*Santangelo v. Comcast Corp.,*
    162 F. Supp. 3d 691 (N.D. Ill. 2016) .............................................. 25

*Siddique v. Laliberte,*
    972 F.3d 898 (7th Cir. 2020) ........................................................... 22

*Silha v. ACT, Inc.,*
    807 F.3d 169 (7th Cir. 2015) ..................................................... 12, 13

*Spokeo v. Robins,*
    136 S. Ct. 1540 (2016) ............................................................ 8, 9, 10

*TAS Distrib. Co. v. Cummins Engine Co.,*
    491 F.3d 625 (7th Cir. 2007)............................................................22

*Thomason v. Nachtrieb,*
    888 F.2d 1202 (7th Cir. 1989)........................................................18

*Thole v. U.S. Bank, N.A.*
    140 S.Ct. 1615 (2020)...........................................................*passim*

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021)....................................................................24

*Vigortone AG Prods., Inc. v. PM AG Prods., Inc.,*
    316 F.3d 641 (7th Cir. 2002)..........................................................15

*Webb v. Frawley,*
    906 F.3d 569 (7th Cir. 2018)..........................................................25

*White v. Vill. of Homewood,*
    628 N.E.2d 616 (Ill. App. Ct. 1993)...........................................18, 19

*Yee v. City of Escondido,*
    503 U.S. 519 (1992).......................................................................22

*Yershov v. Gannett Satellite Information Network, Inc.,*
    820 F.3d 482 (1st Cir. 2016) ...........................................................5

*Zahn v. N. Am. Power & Gas LLC,*
    847 F.3d 875 (7th Cir. 2017)............................................................1

*Zegers v. Zegers, Inc.,*
    458 F.2d 726 (7th Cir. 1972)..........................................................13

## Rules and Statutory Provisions

45 C.F.R. § 164........................................................................................21

410 ILCS 50 .............................................................................................21

## Other Authority

3 Williston on Contracts § 7:41 (4th ed.) ..............................................19

17A Am. Jur. 2d Contracts § 149 ............................................................................ 19

Alvin Rajkomar *et al.*, *Scalable and Accurate Deep Learning with Electronic Health Records*,
    1 NPJ DIGITAL MEDICINE ................................................................. 1, 4

Google Cloud Next, *Sensitive data management for collaborative research clouds* (2017),
    https://chicagoitm.org/itm-investigators-present-at-google-cloud-next-conference/ ........................................................................................... 2, 3

Restatement (Second) of Torts ............................................................................ 26

## ARGUMENT

### I.    Mr. Dinerstein Alleges that His Medical Records Were Not Anonymous.

As the district court recognized, A18, Mr. Dinerstein alleges that the medical records sold by the University to Google "were not sufficiently anonymized." A67 ¶ 68. *See also* A67-A68 ¶ 69 ("[A]ny redaction or anonymization of free-text notes was insufficient to protect patients' anonymity."); A76-A77 ¶ 95 ("The University did not properly de-identify Dinerstein's medical health records[.]"). Refusing to accept these allegations as true, *cf. Zahn v. North American Power & Gas, LLC*, 847 F.3d 875, 877 (7th Cir. 2017), the University contends that the medical records it sold to Google were, in fact, anonymous.

In support of this contention, the University cites two things: a portion of the complaint that references a journal article published by the University and Google in which the records are described as "de-identified," A66 ¶ 64 (citing Alvin Rajkomar et al., *Scalable and accurate deep learning for electronic health records*, 1 NPJ Digital Medicine, January 2018 at 4, available at https://www.nature.com/articles/s41746-018-0029-1), and the University's agreement with Google, which states that as part of the sale, "the majority of identifiers will be removed" from the records, A110, and that "free text data … have gone through [a] deidentification process." A111.

From this, the University draws an inference in its favor that the records are anonymous. *See, e.g.*, Univ. Br. 18 ("[A] person reviewing those records … would have no way of knowing from those records that the unidentified patient was

1

Dinerstein."). But assuming the records actually went through some "deidentification process," A111, that doesn't mean the finished product was anonymous. And in fact, the complaint plausibly alleges otherwise.

Specifically, the complaint alleges that "these records were not sufficiently anonymized and put the patients' privacy at grave risk." A67 ¶ 68. Zeroing in on the free-text notes—which the University all but ignores in its brief—the complaint alleges that "any redaction or anonymization of free-text notes was insufficient to protect patients' anonymity." A67-68 ¶ 69. In support, the complaint references a 2017 talk at a Google conference by the University's Associate Chief Research Informatics Officer, Dr. Samuel Volchenboum. *Id.* At that talk, Dr. Volchenboum explained that de-identification of healthcare records—especially free-text notes— "is a hard problem." Google Cloud Next, *Sensitive data management for collaborative research clouds* (2017), https://chicagoitm.org/itm-investigators-present-at-google-cloud-next-conference/, at 44:55. To illustrate, he offered an example of how a typical de-identification process would remove names from free-text notes:



Dr. Volchenboum explained that such de-identification would be insufficient because it leaves a host of information in the note from which the patient could be identified: his age, his residence at various points in his life, some personal tragedies, and the size of his family. In Dr. Volchenboum's words, such a note—even after being purportedly de-identified—"is actually quite identifiable." *Id.* at 47:15.



Thus, despite the University and Google agreeing that the medical records' free-text notes would go through "[a] deidentification process," A111, and publicly touting the same, A67 ¶ 68, it is entirely plausible that the purportedly de-identified records were, as the complaint alleges, "not sufficiently anonymized." A67 ¶ 68.[1]

In addition to the insufficiently-anonymized free-text notes, the complaint alleges another privacy problem with the medical records: the disclosure of treatment locations and datestamps to a data-miner like Google. A49-A50 ¶ 5; A75 ¶ 87. Admittedly, unlike free-text notes, this kind of information is not necessarily something that, on its face, would allow a typical human reader to identify the subject of a medical record. But, as the complaint alleges, unlike a typical human reader, Google knows who the subject of a particular medical record is based on those two data points. A70-A75 ¶¶ 80-87. Consequently, when disclosed to someone like Google, medical records containing treatment locations and datestamps are not truly anonymous.

As the First Circuit explained in a case where a consumer alleged that an app developer had disclosed his GPS location and Android ID (a unique alphanumeric identifier associated with his mobile device) to Adobe, a large data-miner that (like Google) has access to troves of other information about individual consumers:

---

[1]     Even the University's and Google's proclamations of de-identification were less than fulsome. The journal article, for example, noted that the "datasets analysed"—i.e., the purportedly de-identified medical records—could not be made publicly available "due to reasonable privacy and security concerns." 1 NPJ DIGITAL MEDICINE at 8.

> [W]hen [defendant] makes such a disclosure to Adobe, it knows that Adobe has the "game program" so to speak, allowing it to link the GPS address and device identifier information to a certain person by name, address, phone number, and more. While there is certainly a point at which the linkage of information to identity becomes too uncertain, or too dependent on too much yet-to-be-done, or unforeseeable detective work, here the linkage, as plausibly alleged, is both firm and readily foreseeable to [defendant].

*Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). And while the University asserts that Google has agreed "not to use the [records] in … a way as to identify any individual," Univ. Br. 7 (quoting A104), how Google ultimately uses the records has no bearing on whether the records themselves are sufficiently anonymous.

With a proper understanding of the complaint's "not sufficiently anonymized" allegations—i.e., that treatment locations and datestamps can be identifying when disclosed to someone like Google, and that even purportedly de-identified free-text notes can be identifying when disclosed to *anyone*—we turn to the University's and Google's substantive arguments.

## II.    Mr. Dinerstein Has Article III Standing.

The University argues that Mr. Dinerstein has failed to allege an Article III injury-in-fact. Ignoring the Supreme Court's warning in *Thole v. U.S. Bank, N.A.*, the University makes Article III standing "more complicated than it needs to be" by challenging what should be straightforward bases for Article III standing. 140 S. Ct. 1615, 1622 (2020). Mr. Dinerstein alleges three different types of injury—invasion of privacy, breach of contract, and pecuniary harm—any of which alone support standing.

## A.     The Disclosure of Mr. Dinerstein's Private Information is an Article III Injury.

As this Court recently explained, "[t]he invasion of a legally protected privacy right, though intangible, is personal and real, not general and abstract," and is thus a sufficient injury-in-fact for purposes of Article III standing. *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1149 (7th Cir. 2020). *See also Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 912 (7th Cir. 2017) ("Violations of rights of privacy are actionable."). Other circuits are in accord. *See, e.g.*, *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638-39 (3d Cir. 2017) ("[W]ith privacy torts, improper dissemination of information can itself constitute a cognizable injury."); *Coulter-Owens v. Time Inc.*, No. 16-1321, 695 Fed. App'x 117, 121 (6th Cir. 2017) ("[T]he disclosure of [private] information is a cognizable injury in fact for purposes of Article III standing."); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598-99 (9th Cir. 2020) (finding invasion of privacy sufficient to support standing). The improper dissemination of his insufficiently-anonymized medical records was an invasion of privacy sufficient to support Mr. Dinerstein's Article III standing.

Citing *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), the University argues that Mr. Dinerstein has alleged only a hypothetical future injury because he fails to allege that Google actually re-identified him from the medical records the University disclosed to it. But as this Court reminds, "it is important not to overread *Clapper*." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 694 (7th Cir. 2015). "*Clapper* was addressing speculative harm based on something that

may not even have happened to some or all of the plaintiffs." *Id.* Specifically, the plaintiffs in *Clapper* "expressed only their fear that the government *might* have intercepted their private communications," which was too speculative to support standing. *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016). "In contrast, the alleged [invasion of privacy here] ha[s] *already* occurred." *Id.* The University—at Google's urging—has *already* disclosed Mr. Dinerstein's insufficiently-anonymized medical records to Google. "[T]here is no need to speculate as to whether [Mr. Dinerstein's] information has been [disclosed] and what information was [disclosed]." *Id.* (internal citation omitted). *See also Remijas*, 794 F.3d at 692 ("Here, the complaint alleges that everyone's personal data has already been stolen."). The invasion of Mr. Dinerstein's privacy—an Article III injury—occurred when the University sold his private medical records to Google; it is not a hypothetical future event.

## B. The Breach of a Contract with Mr. Dinerstein is an Article III Injury.

The University's breach of the Agreement with Mr. Dinerstein is likewise an Article III injury. "When one party [to a contract] fails to honor its commitments, the other party to the contract suffers a legal injury sufficient to create standing even where that party seems not to have incurred monetary loss or other concrete harm." *J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 650-51 (7th Cir. 2014). *See also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) ("In most kinds of litigation, there is scant need for courts to pause over the standing inquiry. One can readily recognize that … a party to a

breached contract bears the kind of claim that he may press in court."); *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017) ("[A] party to a breached contract has a judicially cognizable interest for standing purposes, regardless of the merits of the breach alleged.") (quotations omitted). That should end the inquiry.

Yet despite this Court's recognition in *J.P. Morgan* that a plaintiff need "not to have incurred monetary loss or other concrete harm" in order to have Article III standing to assert a claim for breach of contract, 760 F.3d at 650-51, the University argues that Mr. Dinerstein must allege some injury beyond the breach itself. In support, the University suggests that *J.P. Morgan* doesn't survive the Supreme Court's decisions in *Spokeo v. Robins*, 136 S. Ct. 1540 (2016), or *Thole* (or, for that matter, several post-*Spokeo* and post-*Thole* decisions of this Court). Sheepishly acknowledging, however, that all of those cases asserted statutory rights, rather than common-law contractual ones as in *J.P. Morgan*, the University argues that "[n]othing in the logic of those opinions, however, turned on that fact." Univ. Br. 32. Nothing could be further from the truth.

The fact that the claim at issue in *Spokeo* was statutory was central to the Court's reasoning. The whole problem in *Spokeo* was how to balance two competing principles. On the one hand, Congress can, by enacting statutes, "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." 136 S. Ct. at 1549. On the other hand, "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Id.* at 1547-48. To thread this

needle, the Court held that while "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right," there are some cases where the violation of a right granted by statute can alone be an Article III injury and "a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id.* at 1549.

But none of that has anything to do with Article III standing to assert common-law claims like breach of contract (or invasion of privacy). Indeed, in determining whether a statutory violation is itself sufficient to establish standing or whether additional harm must be alleged, *Spokeo* instructs courts to look to common-law history. *Id.* And as Justice Thomas explained in his *Spokeo* and *Thole* concurrences, common-law courts imposed different limitations on a plaintiff's right to bring suit depending on the type of right the plaintiff sought to vindicate. While plaintiffs alleging violations of public rights—such as general compliance with regulatory law—have needed to make a further showing of injury to themselves, plaintiffs alleging violations of private rights—such as rights of personal security, property rights, and contract rights (the kinds of rights Mr. Dinerstein asserts here)—have not. *Spokeo*, 136 S. Ct. at 1551-53 (Thomas, J., concurring); *Thole*, 140 S. Ct. at 1623 (Thomas, J., concurring). *See also Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 624 (7th Cir. 2020) (applying Justice Thomas's "useful distinction" between public and private rights).

Nor, contrary to the University's suggestion, does *Thole*, an ERISA case, undermine this Court's holding in *J.P. Morgan* that a breach of contract is alone an Article III injury-in-fact. Even if statutory ERISA rights were treated the same as common-law contractual rights, the petitioners in *Thole* didn't lack standing because an invasion of their rights wasn't sufficient without some additional resulting harm; they lacked standing because they didn't have the asserted legal rights in the first place. 140 S. Ct. at 1620 ("[H]ere, the plan's claims have not been legally or contractually assigned to [petitioners]."); *id.* at 1623 (Thomas, J., concurring) ("There is … no need to analogize petitioners' complaint to trust law actions, derivative actions, *qui tam* actions, or anything else. We need only recognize that the private rights that were allegedly violated do not belong to petitioners under ERISA or any contract.").

A common-law breach of contract has long been sufficient to support Article III standing without allegations of additional harm. Neither *Spokeo* nor its progeny change that. Thus, in addition to the invasion of his privacy, the University's breach of the Agreement with Mr. Dinerstein is—alone—an Article III injury-in-fact.

### C. The Pecuniary Harm Suffered by Mr. Dinerstein is an Article III Injury.

Finally, even though additional harm is not required for his common-law claims (but to the extent it is required to support his Consumer Fraud Act claim), Mr. Dinerstein has alleged pecuniary harm resulting from the University's and Google's conduct. As explained in his opening brief, Mr. Dinerstein contracted with the University for medical treatment plus confidentiality but received only medical

treatment. When the University failed to provide the promised confidentiality (i.e., when it rendered only partial performance), Mr. Dinerstein suffered two types of pecuniary harm.

First, he lost money in the form of the difference in value between what he paid for (treatment with confidentiality) and what he actually received (treatment *without* confidentiality). That is an Article III injury. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016) (paying for a digital magazine subscription with a privacy policy but receiving only a subscription without the promised privacy protection was an Article III injury-in-fact); *Aqua Dots Prods. Liability Litig.*, 654 F.3d 748, 750-51 (7th Cir. 2011) (paying for presumably-safe toys that in fact posed risks to children was a financial injury sufficient to support Article III standing). The University argues that this kind of overpayment injury supports Article III standing "only where the product itself was defective or dangerous and consumers claim they would not have bought it (or paid a premium for it) had they known of the defect." Univ. Br. 33 (quoting *Lewert*, 819 F.3d at 968; citing *Remijas*, 794 F.3d at 694-95). But Mr. Dinerstein has alleged both of these things. While the University is correct that Mr. Dinerstein asserts no quarrel with the medical *treatment* he received, he does allege that the promised *confidentiality* of his medical records was defective. And, as the University grudgingly acknowledges, he specifically alleges that the value of health care services without adequate privacy protections is worth less than the value of health care services *with* adequate protections, and that he would not have paid the University had he known it would

11

not keep his medical records confidential. A80-A82 ¶¶ 112, 116, 121. Such allegations were absent in *Lewert* and *Remijas*.

This Court's skepticism of overpayment injury in *Lewert* and *Remijas* was understandable in light of the absence of an express promise of credit card confidentiality and the implausibility of payment for an implied promise of such confidentiality given that customers paid the same price for cash and credit card transactions. *See* Dinerstein Br. 24. But no such skepticism is warranted here where, as in *Carlsen*, Mr. Dinerstein alleges that he paid for a service that came with an express promise of confidentiality but that ultimately was not provided. 833 F.3d at 909.

The second type of pecuniary harm suffered by Mr. Dinerstein is the University's conversion of the value of the private information he provided to it. This, too, is an economic harm sufficient to support Article III standing. *Facebook*, 956 F.3d at 601 (defendant's unauthorized use of plaintiffs' information for defendant's profit, and for which plaintiffs sought disgorgement, was an Article III injury).

The University does not dispute that this information has value. Indeed, it would be hard-pressed to do so given that it was able to sell Mr. Dinerstein's information to Google and that Google stands to develop profitable software based on it. Instead, the University argues that an injury-in-fact "cannot be based solely on a defendant's gain; it must be based on a plaintiff's loss." Univ. Br. 36 (quoting *Silha v. ACT, Inc.*, 807 F.3d 169, 174-75 (7th Cir. 2015)). But whatever that general

observation means, it doesn't mean that the University's sale of Mr. Dinerstein's confidential medical information in violation of the Agreement not to do so was not an actual injury to him. Where, as here, a plaintiff is entitled to recover profits for the unauthorized use of his private but valuable information, the unauthorized use is a pecuniary harm to the plaintiff sufficient to support Article III standing. *Facebook*, 956 F.3d at 601 ("This unauthorized use of their information for profit would entitle Plaintiffs to profits unjustly earned. Thus, Plaintiffs sufficiently alleged a state law interest whose violation constitutes an injury sufficient to establish standing[.]").[2]

*Silha* does not require otherwise. In that case, unlike here, "Plaintiffs consented to participate in the information exchange programs offered by Defendants." 807 F.3d at 174. Thus, the alleged injury was not that defendants had disclosed information that plaintiffs wanted to keep private, but that defendants had done so for profit. And "[t]he fact that Defendants allegedly collected a fee [from the third-parties to whom they disclosed plaintiffs' information] and did not disclose this sale did not make Plaintiffs worse off." *Id.* at 175. Here, in contrast, the University's disclosure of Mr. Dinerstein's private information in violation of the

---

[2]     The University suggests that Mr. Dinerstein needed to have alleged that its unauthorized sale of his information decreased its value and/or that he planned to sell it himself. Univ. Br. 36. The Ninth Circuit rejected precisely that argument in *Facebook*. 956 F.3d at 599. Indeed, a plaintiff need not be planning to wring the commercial value out of his own information in order to be harmed by someone else's doing so. *See, e.g.*, *Zegers v. Zegers, Inc.*, 458 F.2d 726, 730 (7th Cir. 1972) ("[I]f [a patent-holder] does not himself sell the product, he may nevertheless be injured by the unlicensed practice of his invention.").

Agreement not to do so *did* make him worse off. While, as explained in his opening brief and below, Mr. Dinerstein may be entitled to disgorgement of the University's profits (or at least a reasonable royalty) for doing so, his Article III injury is based on his loss, not the University's gain.

## III.   The Illinois Supreme Court Would Likely Recognize the Tort of Breach of Confidence Here.

Turning to the merits, the University argues that this Court should neither find that Illinois would likely recognize the tort of breach of medical confidentiality nor certify the question to the Illinois Supreme Court to find out for sure. The University suggests that the Court not do so because, according to the University, the tort represents an "adventurous departure[] in state common law" and a "creative but unlikely state cause of action … devise[d] from a blank slate." Univ. Br. 21, 25 (quotations omitted). Such characterizations might be deserved if Mr. Dinerstein were asking this Court to find that Illinois would likely adopt a completely unprecedented or minority position of law. *See, e.g.*, *Ross v. Creighton Univ.*, 957 F.2d 410, 414-15 (7th Cir. 1992) (finding Illinois unlikely to recognize tort where "the overwhelming majority of states that have considered this type of claim have rejected it"). But here, a "clear modern consensus" of courts has recognized the tort. *Lawson v. Halpern-Reiss*, 212 A.3d 1213, 1217-18 (Vt. 2019). Indeed, unlike in *Ross*, where other states had lined up 11-1 *against* recognizing the tort at issue there, 957 F.2d at 415 & n.2, the tally here is 15-1 *in favor*. Dinerstein Br. 11-13 (collecting cases).

14

The University tries to brush aside the 15-1 tally, calling it "flat wrong" and asserting that "*no* other court has ever recognized the tort claim that Dinerstein asserts: that a hospital breaches a duty of medical confidentiality by sharing *non-identified* medical records with a research partner who has explicitly agreed not to make any attempt to re-identify those records." Univ. Br. 21. But simply incanting the phrase "non-identified" throughout a brief does not make it so. As explained above, the University's description of the circumstances here is contrary to the facts alleged in the complaint—that the medical records sold to Google were *not* sufficiently anonymized. Properly read, it's no stretch at all to think that Mr. Dinerstein's complaint—alleging the unauthorized sale of insufficiently-redacted (at best) medical records to a data-miner like Google—states a claim for breach of confidence as that tort is understood by other states. *See, e.g.*, *Byrne v. Avery Ctr. for Obstetrics & Gynecology, P.C.*, 175 A.3d 1, 17 (Conn. 2018) ("[U]nauthorized disclosure of confidential information obtained in the course of [the physician-patient] relationship for the purpose of treatment gives rise to a cause of action sounding in tort against the health care provider, unless the disclosure is otherwise allowed by law."); *Biddle v. Warren Gen. Hosp.*, 715 N.E.2d 518, 523 (Ohio 1999); *Fairfax Hosp. by & through INOVA Health Sys. Hosps., Inc. v. Curtis*, 492 S.E.2d 642, 645 (Va. 1997).

Nor is it a stretch to think that, in light of the clear consensus of other states, Illinois would also recognize the tort. *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002) ("When state law on a question is

unclear … the best guess is that the state's highest court, should it ever be

presented with the issues, will line up with the majority of the states."). Indeed, the

"refusal to accept a perceptible trend" can be an incorrect ascertainment of state

law. *Birnbaum v. U.S.*, 588 F.2d 319, 326 (2d Cir. 1978).

The University argues that Illinois courts have already declined to recognize

such a tort, but that's not the case. The *Petrillo* footnote cited by the University can

hardly be read as a rejection of the tort. *See* Univ. Br. 24 (citing *Petrillo v. Syntex

Labs., Inc.*, 499 N.E.2d 952, 962 n.3 (Ill. App. Ct. 1986)). In that footnote, the court

"note[d], without deciding, that many jurisdictions have recognized the existence, on

the patient's behalf, of a cause of action for 'Breach of confidence' where a physician

discloses a patient's medical confidences without the patient's consent." *Petrillo*, 499

N.E.2d at 962 n.3. But the *Petrillo* court had no reason to decide the issue; the

appeal before it was from an order holding a defense attorney in contempt for

violating a court order barring ex parte communications with the plaintiffs'

physician. *Id.* at 954. Similarly, as Mr. Dinerstein explained in his opening brief,

the footnote to which the University points in *Best v. Taylor Machine Works*, 689

N.E.2d 1057 (Ill. 1997), was (a) dicta, and (b) is best read as the court's refusal to

read a private cause of action into the state constitution's privacy clause. Dinerstein

Br. 12-13 n.3. But refusing to read a cause of action into the state constitution says

nothing about Illinois's willingness to allow common-law causes of action for

invasions of privacy, which have long been recognized in this state. *Id.* (citing

*Leopold v. Levin*, 259 N.E.2d 250, 254 (Ill. 1970)). Indeed, rather than rejecting a

16

breach of confidence tort for the unauthorized disclosure of confidential medical information, *Petrillo* and *Best* provide strong evidence that Illinois would join the other states in recognizing such a tort. *Petrillo*, 499 N.E.2d at 960 ("[P]atients in Illinois possess a similar right [to patients in other states]; namely, the right to rely on physicians to faithfully execute their ethical duties and thereby protect the confidentiality of the physician-patient relationship."); *Best*, 689 N.E.2d at 1100 ("We conclude that patients in Illinois have a privacy interest in confidential medical information, and that the *Petrillo* court properly recognized a strong public policy in preserving patients' fiduciary and confidential relationship with his or her physicians.").

Finally, the University makes a cursory policy argument that recognizing the tort would create a "dramatic chilling effect" on "commonplace medical research techniques that rely on analyzing large sets of non-identified patient data." Univ. Br. 24. But if what the University is alleged to have done here—sold insufficiently-anonymized medical records to Google—is commonplace, it *should* be deterred. Chilling incomplete or ineffective "de-identification processes" and encouraging medical providers to take more care in their handling of patient information would be a good thing.

At the end of the day, this Court is free to, and should, find that Illinois would likely recognize an action for breach of confidence here. Alternatively, if genuinely uncertain about what the Illinois Supreme Court would do, this Court is free to, and should, certify the question. Dinerstein Br. 15-16. Either way, the

district court's dismissal of Mr. Dinerstein's breach of confidence claims should be reversed.[3]

## IV. Mr. Dinerstein States a Claim for Breach of Contract.

The University attacks Mr. Dinerstein's breach of contract claim on three fronts: that there was no consideration, that there was no breach, and that there were no damages. Each is without merit.

### A. The Agreement is Not Unenforceable for Lack of Consideration.

The University argues that its promise of confidentiality set forth a pre-existing legal duty that cannot serve as consideration for the Agreement with Mr. Dinerstein. But the University misunderstands the pre-existing duty rule. A promisor that agrees to comply with statutory obligations still breaches a contract when it fails to live up to that promise. The pre-existing duty rule simply prevents a promisor from using a pre-existing duty as consideration to extract an enforceable return promise, such as an exculpatory clause. *See, e.g.*, *White v. Vill. of Homewood*,

---

[3]     The University suggests in passing that Mr. Dinerstein's clarification in the briefing below that his privacy tort claim was for breach of confidence rather than intrusion upon seclusion was "procedurally improper." Univ. Br. 19 (citing *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989)). But while a plaintiff might not be permitted to amend factual allegations through briefing on a motion to dismiss, it can use such briefing to change its theory as to why the facts alleged entitle it to relief. *Compare Thomason*, 888 F.2d at 1205 ("[A] complaint may not be amended by the briefs in opposition to a motion to dismiss[.]") *with Hart v. Transit Mgmt. of Racine, Inc.*, 426 F.3d 863, 866 (7th Cir. 2005) ("A plaintiff may initially plead a legal theory unsustainable on the facts contained in the complaint but later survive dismissal by suggesting, in response to a motion to dismiss under Rule 12(b)(6), a theory that would give rise to relief on facts not inconsistent with those in the complaint.") *overruled on other grounds by Humphries v. CBOCS W., Inc.*, 474 F.3d 387 (7th Cir. 2007). *See also* Dinerstein Br. 6 n.1.

628 N.E.2d 616, 618 (Ill. App. Ct. 1993) ("For example, where a guest was by statute entitled to use a hotel safe to store valuables, a promise by the guest to limit the liability of the hotel in exchange for using the safe is not supported by consideration because of the pre-existing duty rule."). *See also* 17A Am. Jur. 2d Contracts § 149 ("[A]lthough a promise to do a thing that the promisor is legally bound to do is not generally sufficient consideration to support a reciprocal undertaking by the promisee, such promise may be enforced against the promisor, notwithstanding that its enforcement compels the performance of what is already a legal obligation."); 3 Williston on Contracts § 7:41 (4th ed.) ("Although a promise of something which the promisor is under a legal duty to perform cannot be valid consideration for a return promise … there is no reason why such a promise should not itself be enforceable if supported by sufficient consideration.").

In any event, the Agreement between Mr. Dinerstein and the University included terms well beyond any pre-existing legal duties—most notably a promise by the University to provide necessary or advisable medical treatment in exchange for a promise by Mr. Dinerstein that he would accept financial responsibility for all such treatment. A93. "If defendant had promised [something] that the law already required, and nothing more, then, arguably, the preexisting-duty rule would prevent the formation of a contract" between Mr. Dinerstein and the University. *Lo v. Provena Covenant Med. Ctr.*, 826 N.E.2d 592, 598-99 (Ill. App. Ct. 2005). But no law required the University to provide treatment to Mr. Dinerstein and no law required him to promise to pay for it. "Each party conferred a benefit on the other,

19

and their mutual benefit is consideration." *Id.* The fact that the Agreement

contained other terms, "many of them mandated by law," does not render the

Agreement unenforceable for lack of consideration. *Id.*[4]

### B.    The Complaint Alleges Breaches of the Agreement.

Next, the University argues that there was no breach of the Agreement.

First, it argues that it did not breach its promise not to sell Mr. Dinerstein's medical

information without his consent because there was no sale. According to the

University, the software it received from Google in exchange for its patients'

medical records "cannot plausibly be described as 'remuneration.'" Univ. Br. 47-48.

But in so arguing, the University once again ignores the allegations in the

complaint. Contrary to the University's unsupported assertion, the software

provided by Google to the University is not like "shar[ing] the results of a joint

project with a colleague." *Id.* Rather, it is providing the University with valuable

software for which it would otherwise have to pay "premium prices." A51 ¶¶ 10-11.

As the district court recognized, this is remuneration. A32.

Second, the University argues that it didn't breach its promise to comply with

HIPAA because its disclosures to Google fall within two regulatory exceptions to

HIPAA's general rule of non-disclosure. Specifically, HIPAA allows the disclosure of

medical information "for research" without patient consent if certain important

---

[4]    This distinguishes the only authority cited by the University in support of its pre-existing duty argument, *Marque Medicos Fullerton, LLC v. Zurich American Insurance Co.*, 83 N.E.3d 1027 (Ill. App. Ct. 2017). In that case, plaintiffs asserted the existence of an implied-in-fact contract based *solely* on defendants' purported agreement to comply with a pre-existing duty. *Id.* at 1043-44.

safeguards are met and a specific process followed. 45 C.F.R. § 164.512(i). HIPAA also allows the disclosure of a well-defined "limited data set" without consent. 45 C.F.R. § 164.514(e). But these two exceptions are irrelevant if—as Mr. Dinerstein sufficiently alleges—the University *sold* his medical records to Google. In any case, as Mr. Dinerstein explained in his opening brief at 31-33, the complaint does not "set forth everything necessary to satisfy" these exceptions. *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). While discovery may ultimately show that the University satisfied all the procedural safeguards required for "research" disclosures without consent under § 164.512(i) and/or that it only disclosed a "limited data set" as defined by § 164.514(e), the allegations in the complaint do not "unambiguously establish" that the University falls into those safe harbors. *Hyson*, 821 F.3d at 939.[5]

## C.     The Complaint Need Not—But Does—Allege Economic Damages.

The University also argues that Mr. Dinerstein's contract claim fails for lack of damages. In his opening brief, Mr. Dinerstein argued that the district court erred by dismissing his contract claim for failing to allege "economic damages." Dinerstein Br. 15-16 (quoting A42). Specifically, Mr. Dinerstein argued (1) that economic damages are not a prerequisite to stating a claim for breach of contract (as

---

[5]     The University also argues that it didn't breach its promise to comply with state law, which, as relevant here, requires that patients who are the subject of "a research program" be given an explanation of the program and the ability to consent to or reject it. 410 ILCS 50/3.1(a). The University simply asserts, however, that its "joint research project with Google" isn't "research" under the state statute, which, as explained in Mr. Dinerstein's opening brief at 33-34, is wrong.

evidenced by the availability of nominal damages and equitable relief), but (2) in any event, he alleged economic damages.[6]

The University cites several cases for the proposition that damages are an element of a breach of contract action in Illinois. Univ. Br. 37-38. But most of those cases simply include "damages" in a list of elements without further discussion, and the two that do take up the issue both involved the question of whether plaintiffs had, post-discovery, ultimately proved their entitlement to monetary relief. *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625 (7th Cir. 2007); *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533 (7th Cir. 2008). Here, at the pleading stage, a purported lack of economic damages does not justify dismissal. *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1372 (7th Cir. 1990); *TAS*, 491 F.3d at 631 n.6 (distinguishing *Olympia Hotels*, explaining that "[t]he difference in procedural posture is significant."). And while the University tries to distinguish some of the cases cited by Mr. Dinerstein with a cursory response of "wholly unpersuasive," Univ. Br. 38-39, it completely ignores others that

---

[6]     The University contends that Mr. Dinerstein forfeited his argument that he need not allege economic damages by not raising it below. But Mr. Dinerstein's argument supports the sufficiency of his contract claim, which was asserted below. *See Bew v. City of Chicago*, 252 F.3d 891, 895-96 (7th Cir. 2001) (citing *Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992)); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). Regardless, this Court has discretion to address issues for the first time on appeal, and "often exercise[s] that discretion to entertain arguments that turn on pure issues of law." *Hively v. Ivy Tech Cmty. Coll. Of Indiana*, 853 F.3d 339, 351 (7th Cir. 2017) (en banc). *Cf. Siddique v. Laliberte*, 972 F.3d 898, 905 (7th Cir. 2020) (refusing to address "inherently fact bound" argument not raised below).

support his contention that Illinois has long permitted claims for breach of contract without economic damages. Dinerstein Br. at 17-18.

Although the words "damage," "damages," and "injury" are sometimes treated loosely as synonyms, there is a material distinction between them. *Giammanco v. Giammanco*, 625 N.E.2d 990, 997 (Ill. App. Ct. 1993). "Injury is the illegal invasion of a legal right; damage is the loss, hurt, or harm which results from the injury; and damages are the recompense or compensation awarded for the damage suffered." *Id.* The proper inquiry on a motion to dismiss is whether damage—not damages—has been alleged. *Id.*

Here, it has. Mr. Dinerstein alleges that the University breached the Agreement not to sell his medical records without consent or to otherwise violate state and federal privacy laws. The University's breach of the Agreement—the invasion of Mr. Dinerstein's legal right—is his injury, and the unwanted disclosure of his private medical records is the damage. This satisfies the damage requirement for a breach of contract claim. The question of damages (with an "s") is what recompense Mr. Dinerstein is entitled to for his damage (without an "s"). And though this goes well beyond the proper inquiry on a motion to dismiss, Mr. Dinerstein proposed a host of available remedies: nominal damages, equitable relief, return of money he paid for the University's deficient performance, and disgorgement of profits the University earned on the unauthorized use of his information or a reasonable royalty for that use.

The University picks nits with these remedies, but even assuming Mr. Dinerstein needs to establish his entitlement to them at the pleading stage, he does so. First, the University claims that nominal damages are available "when a plaintiff has suffered *some* injury from a breach of contract, but fails to prove the amount of that injury with adequate certainty." Univ. Br. 39. But, as explained above, Mr. Dinerstein *has* suffered injury (and damage) from the University's breach. And, regardless, as the Supreme Court recently explained, "[n]ominal damages are not a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages. They are instead the damages awarded by default until the plaintiff establishes entitlement to some other form of damages." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800 (2021).

The University also takes issue with Mr. Dinerstein's overpayment, disgorgement, and reasonable royalty theories, but, for the same reasons that they support Article III standing, these theories support Mr. Dinerstein's contract claim. In addition, the University asserts that Mr. Dinerstein is not entitled to any disgorgement or reasonable royalty because of a line in the Agreement purportedly disclaiming compensation for any value derived from his medical information. Univ. Br. 36. But Mr. Dinerstein alleges that the use of his information was in breach of the Agreement, and "[a] party who materially breaches a contract cannot take advantage of the terms of the contract that benefit him." *James v. Lifeline Mobile Medics*, 792 N.E.2d 461, 464 (Ill. App. Ct. 2003).

**V.    Mr. Dinerstein Sufficiently Alleged a Consumer Fraud Act Violation.**

With respect to Mr. Dinerstein's Consumer Fraud Act claim, most of the University's arguments mirror the standing and damages issues discussed above. The only additional argument—that the claim fails because it is duplicative of his breach of contract claim, Univ. Br. 57 n.13—is wrong. The allegations supporting his Consumer Fraud Act claim are not merely that the University breached its patient contracts; rather, he alleges that the University "made affirmative false representations … on a widespread basis" for the purpose of attracting more business. *Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691, 704 (N.D. Ill. 2016); A56 ¶ 31; A80 ¶¶ 109-11. Because these allegations go "beyond a simple breach of contract," they are not duplicative. *Santangelo*, 162 F. Supp. 3d at 704 (citing *Rumford v. Countrywide Funding Corp.*, 678 N.E.2d 369, 373 (Ill. App. Ct. 1997)).

**VI.    Mr. Dinerstein Sufficiently Alleged Tortious Interference with Contract.**

Finally, Google challenges Mr. Dinerstein's tortious interference claim. While Google correctly states that, in order to constitute tortious interference, its conduct must have been "immediately directed at" the University, Google Br. 7-8 (quoting *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018)), and requires "some active persuasion, encouragement, or inciting," Google Br. 9, it fails to explain how Mr. Dinerstein's allegations are deficient in this regard. As explained in his opening brief at 37, Mr. Dinerstein's complaint alleges that, following years of unsuccessful attempts to obtain patient-level data from other hospitals, Google was able to convince the University to provide it such data. In contrast to *Webb*, where this

Court found "nothing in the complaint [that] alleges that [defendant] was involved in [the third-party breacher's] decision to [engage in breaching conduct], much less that [defendant] was an active participant in that decision-making process," 906 F.3d at 579, Mr. Dinerstein's complaint specifically alleges that Google was an active participant in the University's decision to sell its patients' confidential medical records. A50-A51 ¶¶ 8, 9.

Google suggests that this isn't enough, because all Google wanted was "to obtain healthcare data"—it didn't necessarily want the University to breach a contract with Mr. Dinerstein. Google Br. 8. But that's not how tortious interference works. Google need not have acted with "the primary purpose of interfering with the performance of the contract." Restatement (Second) of Torts § 766 cmt. *j*.[7] Rather, Google can be liable for "an interference that is incidental to [its] independent purpose and desire but known to [it] to be a necessary consequence of [its] action." *Id.* In other words, Google doesn't have to intend or desire that the University breach its patients' confidentiality agreements, Google only has to intend that the University engage in the conduct that ends up breaching those agreements—that the University "choose one course of conduct rather than another." *Id.* cmt. *h*. That's exactly what Mr. Dinerstein alleges: Google wanted patient records from the University and intentionally induced the University to sell it those records, which breached the University's confidentiality agreements. And while Google knew of the

---

[7]     "Illinois courts have frequently relied on the Restatement (Second) of Torts in assessing tortious interference claims." *JamSports & Ent., LLC v. Paradama Prods., Inc.*, 360 F. Supp. 2d 905, 906-07 (N.D. Ill. 2005) (collecting cases).

agreements, whether Google cared or even believed that those agreements were being breached is irrelevant. *See* Dinerstein Br. 37-39.[8]

## CONCLUSION

For the reasons discussed in Mr. Dinerstein's opening brief and above, the district court's order dismissing his complaint should be reversed, and the case remanded for further proceedings.

Dated: April 19, 2021                     Respectfully submitted,

                                          **MATT DINERSTEIN**,

                                          By: s/Roger Perlstadt
                                          *One of Plaintiff-Appellant's Attorneys*

                                          Ryan D. Andrews
                                          randrews@edelson.com
                                          Roger Perlstadt
                                          rperlstadt@edelson.com
                                          Alexander G. Tievsky
                                          atievsky@edelson.com
                                          EDELSON PC
                                          350 North LaSalle Street, 14th Floor
                                          Chicago, Illinois 60654
                                          Tel: 312.589.6370
                                          Fax: 312.589.6378

                                          *Counsel for Plaintiff-Appellant*

---

[8]     To be clear, Mr. Dinerstein alleges that Google knew that the sale breached the agreements. A76 ¶¶ 90, 156.

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Circuit Rule 32(c) because it contains 6,970 words, excluding the parts of the document excepted by Fed. R. App. P. 32(f). This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 Business in 12-point Century Schoolbook font.

Dated: April 19, 2021                    By: s/Roger Perlstadt